Harry R. JACKSON, Jr.,
et al., Appellants,

v.

DISTRICT OF COLUMBIA BOARD OF ELECTIONS AND ETHICS, Appellee, and District of Columbia, Intervenor–Appellee.

No. 10–CV–20.

District of Columbia Court of Appeals.

Argued en banc May 4, 2010.
Decided July 15, 2010.

Austin R. Nimocks, Biloxi, MS, with whom Timothy J. Tracey and Cleta Mitchell, Washington, DC, were on the brief, for appellants.

Rudolph McGann filed a brief for appellee.

Todd S. Kim, Solicitor General for the District of Columbia, with whom Peter J. Nickles, Attorney General for the District of Columbia, Donna M. Murasky, Deputy Solicitor General, and Stacy L. Anderson, Assistant Attorney General, were on the brief, for intervenor-appellee.

D. Jean Veta, Thomas S. Williamson, Jr., Paul A. Ainsworth, Anne Y. Lee, Washington, DC, Richard Anthony Lopez and Jonathan Herczeg, Washington, DC, filed an amicus curiae brief for Trevor S. Blake, II, Jeff Krehely, Amy Hinze–Pifer, Rebecca Hinze–Pifer, Thomas F. Metzger, Vincent N. Micone, III, Reginald Stanley, Rocky Galloway, D.C. Clergy United, Lambda Legal Defense and Education Fund, Inc., and the Campaign for All DC Families, in support of appellees.

Miriam R. Nemetz and Jasmin Sethi, Washington, DC, filed an amicus curiae brief for the American Psychoanalytic Association, the National Association of Social Workers, the National Association of Social Workers, Virginia Chapter, the National Association of Social Workers, District of Columbia Chapter and the National Association of Social Workers, Maryland Chapter, supporting appellees.

Before WASHINGTON, Chief Judge, and RUIZ, REID, GLICKMAN, KRAMER, FISHER, BLACKBURNE–RIGSBY, THOMPSON and OBERLY, Associate Judges.

THOMPSON, Associate Judge:

The specific issue before us in this appeal is whether the District of Columbia Board of Elections and Ethics (the "Board") acted lawfully when it rejected appellants' proposed initiative measure on the ground that the measure would authorize, or have the effect of authorizing, dis-

crimination prohibited by the Human Rights Act, and therefore was not a proper subject of initiative. As will be seen, however, the underlying issues are much broader and more fundamental. They concern (1) the allocation of the power to enact laws governing the District of Columbia, within the framework of the District of Columbia Home Rule Act; (2) the broad legislative authority that Congress conferred on the Council of the District of Columbia ("the Council" or "the Home Rule Council"), subject to specific enumerated limitations; (3) the deference this court owes to the Council with respect to the meaning of the law that the Council passed to enable the people of the District of Columbia to share in the Council's legislative power through an amendment to the Home Rule Charter, (and, in particular, the deference we owe to the Council's interpretation of the Charter amendments, as reflected in the nearly contemporaneous implementing legislation that the Council passed); (4) the right of the people of the District to legislate through the initiative process, a right that Congress affirmatively approved when it voted to accept the Charter amendment; and (5) the unique importance of the Human Rights Act, the District's comprehensive anti-discrimination law, which the people of the District of Columbia, speaking through their elected representatives, have long intended to have the "highest priority." Thus, once again, we are called upon "to interpret a unique and complex governmental structure" that is the District of Columbia under Home Rule. *Convention Ctr. Referendum Comm. v. District of Columbia Bd. of Elections & Ethics*, 441 A.2d 889, 916 (D.C.1981) (en banc) ("*Convention Ctr. III* ").

Appellants' challenge focuses on the validity of Council legislation that requires the Board to refuse to accept any proposed initiative that would authorize, or have the effect of authorizing, discrimination prohibited by the Human Rights Act (a requirement that we refer to herein as the "Human Rights Act safeguard"). Specifically, appellants contend that, in establishing that requirement, the Council overstepped its authority and acted in contravention of the District of Columbia Charter. Alternatively, appellants contend that the proposed initiative would not authorize or have the effect of authorizing prohibited discrimination. We disagree with both contentions, and we therefore affirm the Superior Court's rulings that the Council acted lawfully in imposing the Human Rights Act safeguard and that the Board correctly determined that the safeguard required it to reject the proposed initiative. As we go on to explain, we reach this result because (1) resolution of this appeal turns on what legislative authority the Council intended to share with the people of the District of Columbia when it passed the Charter Amendments Act (the "CAA"); (2) the Human Rights Act safeguard is not inconsistent with the Council's intent as conveyed by the language of the CAA; (3) this court owes substantial deference to the Council's legislative interpretation that the Human Rights Act safeguard carries out the intent of the CAA; (4) the relevant history convinces us that the Council could not have intended to authorize, as a proper subject of initiative, any initiative that would have the effect of authorizing discrimination prohibited by the Human Rights Act; (5) the Home Rule Act gave the Council authority to direct the Board, through the legislation that the Council passed to implement the CAA, to refuse to accept an initiative that would authorize prohibited discrimination; and (6) the Board correctly determined that the proposed initiative would have the effect of authorizing such discrimination. On the

last of these points, our court is unanimous.

## I. Factual and Procedural Background

On May 5, 2009, the Council passed the Jury and Marriage Amendment Act of 2009 ("JAMA"). D.C. Act 18–70, 56 D.C.Reg. 3797 (May 15, 2009). JAMA amended the District's marriage laws to provide that the District will recognize lawful, same-sex marriages entered into in other jurisdictions. *See* D.C.Code § 46–405.01 (2009 Supp.).[1] JAMA became law on July 7, 2009, after Congress did not disapprove it.

On September 1, 2009, appellants—Harry Jackson, Jr., Robert King, Walter Fauntroy, James Silver, Anthony Evans, Dale Wafer, Melvin Dupree, and Howard Butler—filed with the Board their proposed "Marriage Initiative of 2009," which is the subject of this appeal. Through the proposed initiative, appellants sought to undo JAMA by amending Title 46, Subtitle I, Chapter 4 of the D.C.Code to state: "Only marriage between a man and a woman is valid or recognized in the District of Columbia." After a public hearing on October 26, 2009, the Board rejected the proposed initiative, finding that it would "authorize[ ], or . . . have the effect of authorizing, discrimination" prohibited

under the Human Rights Act and therefore was "not a proper subject of initiative." D.C.Code § 1–1001.16(b)(1)(C) (2006).[2] Appellants sought a writ of mandamus, asking the Superior Court to order the Board to take the necessary steps to certify the initiative to allow it to be placed on the ballot. Appellants also moved for summary judgment. The District of Columbia intervened in support of the Board and moved to dismiss the complaint or, in the alternative, for summary judgment.

In the meantime, the Council adopted the Religious Freedom and Civil Marriage Equality Amendment Act of 2009 (the "Marriage Equality Act") upon its second reading on December 15, 2009. D.C. Act 18–248, 57 D.C.Reg. 27 (Jan. 1, 2010). This legislation, which became effective as D.C. Law 18–110 on March 3, 2010, *see* 57 D.C.Reg. 1833 (Mar. 5, 2010), expanded the definition of marriage in the District to include same-sex couples: "Any person may enter into a marriage in the District of Columbia with another person, regardless of gender, unless the marriage is expressly prohibited by" District law. D.C.Code § 46–401(a) (Supp.2010); 57 D.C.Reg. 27 (Jan. 1, 2010). Thus, the Marriage Equality Act makes civil marriage available to same-sex couples, just as

---

1. The statute states: "A marriage legally entered into in another jurisdiction between 2 persons of the same sex that is recognized as valid in that jurisdiction, that is not expressly prohibited by §§ 46–401.01 through 46–404, and has not been deemed illegal under § 46–405, shall be recognized as a marriage in the District." *Id.*

2. In its entirety, D.C.Code § 1–1001.16(b)(1) (2006) reads:

Upon receipt of each proposed initiative or referendum measure, the Board shall refuse to accept the measure if the Board finds that it is not a proper subject of initiative or referendum, whichever is applicable, under the terms of title IV of the District of Co-

lumbia Home Rule Act, or upon any of the following grounds:
(A) The verified statement of contributions has not been filed pursuant to §§ 1–1102.04 and 1–1102.06;
(B) The petition is not in the proper form established in subsection (a) of this section;
(C) *The measure authorizes, or would have the effect of authorizing, discrimination prohibited under Chapter 14 of Title 2;* or
(D) The measure presented would negate or limit an act of the Council of the District of Columbia pursuant to § 1–204.46.
*Id.* (italics added). The italicized language, section 1–1001.16(b)(1)(C), sets forth what we refer to as the Human Rights Act safeguard.

it does to opposite-sex couples. It also provides that judges of record, the Clerk of the Superior Court of the District of Columbia or such deputy clerks as the Clerk may designate, and "every minister of any religious society approved or ordained according to the ceremonies of his religious society" may celebrate marriages in the District. *Id.* § 46–406(b). However, it does not require a minister of any religion to celebrate any marriage. Rather, the Council expressed in the preamble to D.C. Act 18–248 its intent to "ensure that no minister of any religious society ... shall be required to solemnize or celebrate any marriage." 57 D.C.Reg. 27.[3] The Mayor signed the Marriage Equality Act, it was transmitted to Congress on January 5, 2010, *see* 57 D.C.Reg. 1833, and it became law on March 3, 2010.[4] *Id.*

By the effective date of the Marriage Equality Act, the Superior Court had ruled on the cross-motions for summary judgment in this litigation. On January 14, 2010, the court granted the District's motion for summary judgment, rejecting appellants' argument that the Human Rights Act safeguard provision is an invalid restriction on the right of initiative and

agreeing with the Board that appellants' proposed initiative would authorize discrimination. This appeal followed. We ordered that the appeal be heard en banc and granted motions by *amici* to file briefs.

## II. Legal Framework

An understanding of the powers of the Council under the Home Rule Act, of the District Charter amendment that created the rights of initiative and referendum, and of the nearly contemporaneous legislation that the Council passed, is critical to our resolution of this appeal. Accordingly, we describe these matters in some detail.

### A. The Home Rule Act

The Constitution vests Congress with the authority "[t]o exercise exclusive Legislation" over the District. U.S. Const. art. I, § 8, cl. 17. In 1973, Congress passed the District of Columbia Self–Government and Government Reorganization Act, Pub.L. No. 93–198, 87 Stat. 777, commonly known as the "Home Rule Act." Title IV of the Home Rule Act sets out the

---

**3.** To that end, the Marriage Equality Act explicitly provides that:

(c) No priest, imam, rabbi, minister, or other official of any religious society who is authorized to solemnize or celebrate marriages shall be required to solemnize or celebrate any marriage.

(d) Each religious society has exclusive control over its own theological doctrine, teachings, and beliefs regarding who may marry within that particular religious society's faith.

(e)(1) Notwithstanding any other provision of law, a religious society, or a nonprofit organization that is operated, supervised, or controlled by or in conjunction with a religious society, shall not be required to provide services, accommodations, facilities, or goods for a purpose related to the solemnization or celebration of a marriage, or the promotion of marriage through religious

programs, counseling, courses, or retreats, that is in violation of the religious society's beliefs.

(2) A refusal to provide services, accommodations, facilities, or goods in accordance with this subsection shall not create any civil claim or cause of action, or result in a District action to penalize or withhold benefits from the religious society or nonprofit organization that is operated, supervised, or controlled by or in conjunction with a religious society.

D.C.Code § 46–406(c)–(e) (Supp.2010).

**4.** The Superior Court, this court, and Chief Justice Roberts, sitting as Circuit Justice, declined to stay the effective date of the Marriage Equality Act. *See Jackson v. District of Columbia Bd. of Elections & Ethics,* —— U.S. ——, 130 S.Ct. 1279, 1280, 176 L.Ed.2d 102 (2010) (Roberts, C.J., in chambers).

District of Columbia Charter, which establishes the organizational structure of the District government. D.C.Code §§ 1–204.01–1–204.115 (2006). The Charter became effective when ratified by the citizens of the District of Columbia through a Charter referendum vote. *See* Home Rule Act, §§ 701, 704 (codified at D.C.Code §§ 1–207.01, 1–207.04 (2006)). The Charter created a tripartite form of government within the District and vested in the Council the broad legislative power granted to the District. D.C.Code § 1–204.04; *Wilson v. Kelly,* 615 A.2d 229, 231–32 (D.C.1992). Section 302 of Title III of the Home Rule Act describes that legislative power in broad terms: "Except as provided in sections 601, 602, and 603 [of the Home Rule Act, codified at D.C.Code §§ 1–206.01 to 1–206.03], the legislative power of the District shall extend to all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of this chapter subject to all the restrictions and limitations imposed upon the states by the 10th section of the 1st article of the Constitution of the United States." D.C.Code § 1–203.02 (2006).[5]

Under the Home Rule Act, the Council is empowered to pass legislation by a majority vote after two readings, at least thirteen days apart. *See* D.C.Code § 1–204.12(a). In general, if the Mayor does not veto an act of the Council within ten days (or if the Council overrides a veto by a two-thirds vote), Council-passed legislation becomes effective after a thirty-legislative-day layover in Congress, unless disapproved by concurrent resolution. D.C.Code § 1–206.02(c)(1) (2006).

Part E of Title VII of the Home Rule Act set forth amendments to the District of Columbia Election Act, D.C.Code §§ 1–1101—1–1115 (1973), and also contained a provision, section 752, entitled "District Council Authority Over Elections." Section 771(e) of the Home Rule Act provided that "Part E of Title VII shall take effect on the date on which title IV is accepted by a majority of the registered qualified electors in the District voting on the charter issue in the charter referendum." Thus, section 752 (codified as D.C.Code § 1–207.52 (2006)), became effective upon ratification of the Charter. Section 752 provides that "[n]otwithstanding any other provision of this Act or of any other law, the Council shall have authority to enact

---

**5.** Sections 601 to 603 expressly restrict the Council's power to legislate in several specific areas. *See* D.C.Code §§ 1–203.02, 1–206.02(a), 1–206.03(c) (2006). The Council has "no authority to pass any act contrary to the provisions of [the Home Rule Act]," except as specifically provided in the Act. *Id.* § 1–206.02(a). The Council may not approve a budget in excess of estimated revenues. *Id.* § 1–206.03(c). In addition, the Council may not "(1) Impose any tax on property of the United States or any of the several states; (2) Lend the public credit for support of any private undertaking; (3) Enact any act, or enact any act to amend or repeal any Act of Congress, which concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District; (4) Enact any act, resolution, or rule with respect to any provision of Title

11 (relating to organization and jurisdiction of the District of Columbia courts); (5) Impose any tax on the whole or any portion of the personal income, either directly or at the source thereof, of any individual not a resident of the District ...; (6) Enact any act, resolution, or rule which permits the building of any structure within the District of Columbia in excess of the height limitations [established by Congress]; (7) Enact any act, resolution, or regulation with respect to the Commission on Mental Health; [or] (8) Enact any act or regulation relating to the United States District Court for the District of Columbia or any other court of the United States in the District other than the District courts, or relating to the duties or powers of the United States Attorney or the United States Marshal for the District of Columbia." D.C.Code § 1–206.02(a)(1)–(8).

any act or resolution with respect to matters involving or relating to elections in the District." *Id.*

## B. The Charter Amendment Act

The legislative history of the Home Rule Act shows that Congress considered including in the Act a provision that would have *directly* conferred on the people of the District the power to propose and enact legislation through an initiative process. *See Home Rule Legislation: Hearing Before the Comm. on the Dist. of Columbia on S. 1603 and S. 1626*, 92d Cong. 161 (1971) (hereinafter, "Hearing on S. 1603 and S. 1626"). As finally enacted, however, the Home Rule Act did not provide for the power of initiative (or of referendum). Section 303 of the Act did, however, provide that the Charter may be amended "by an act passed by the Council and ratified by a majority of the registered qualified electors of the District voting in the referendum held for such ratification." D.C.Code § 1–203.03(a) (2006).[6] On May 17, 1977, the Council exercised its authority under section 303 to pass the Initiative, Referendum, and Recall Charter Amendment Act of 1977 (the "CAA"). 24 D.C.Reg. 199 (July 8, 1977); *see also* 25 D.C.Reg. 244 (July 14, 1978). The Council amended the

CAA on November 1, 1977, making technical changes to the legislation before it was presented to the voters. H.R.Rep. No. 95–891, at 24 (1978). The District's electorate ratified the CAA on November 7, 1977, each House of Congress affirmatively approved it, and the CAA (and, thus, an amended Charter providing for the right of initiative) became effective on March 10, 1978. *Hessey v. District of Columbia Bd. of Elections & Ethics*, 601 A.2d 3, 12 (D.C.1991) (en banc); *Convention Ctr. Referendum Comm. v. District of Columbia Bd. of Elections & Ethics*, 399 A.2d 550, 551 (D.C.1979) ("*Convention Ctr. I* "); 25 D.C.Reg. 244 (July 14, 1978).

The CAA, codified at D.C.Code §§ 1–204.101—1–204.115, provides in its definitional section that "[t]he term 'initiative' means the process by which the electors of the District of Columbia may propose laws (except laws appropriating funds) and present such proposed laws directly to the registered qualified electors of the District of Columbia for their approval or disapproval." *Id.* § 1–204.101(a).[7] The CAA provided a "very broad" right for the District's electorate to utilize the initiative and referendum process.[8] *Hessey*, 601 A.2d at 12. However, the initiative and referendum provisions were not self-executing and did not include particulars about how

---

**6.** Section 303 specifically provides, however, that the portions of Title IV relating to establishment of the Council, the Office of the Mayor, and the judicial system as the tripartite form of government are not subject to amendment (except by Congress).

The House-passed Home Rule bill would have permitted initiative petitions for Charter amendments, while the Senate bill would have required all Charter amendments to originate with Congress. The Conference resolution was to permit the Council alone to originate Charter amendments. *See* H.R.Rep. No. 95–890, at 2 (1978) (Conf.Rep.).

**7.** Section 1–204.101(b) states that "[t]he term 'referendum' means the process by which the

registered qualified electors of the District of Columbia may suspend acts of the Council of the District of Columbia (except emergency acts, acts levying taxes, or acts appropriating funds for the general operation budget) until such acts have been presented to the registered qualified electors of the District of Columbia for their approval or rejection." *Id.*

**8.** For example, in September 1982, citizens adopted an initiative providing for "severe mandatory minimum sentences for, among others, persons who committed offenses while armed with a pistol or firearm." *Lemon v. United States*, 564 A.2d 1368, 1379 (D.C. 1989).

the initiative or referendum process would be implemented. *Convention Ctr. I*, 399 A.2d at 552–53. Instead, the CAA affirmatively required the Council to "adopt such acts as are necessary to carry out the purpose of [the Act] within 180 days of the effective date of [the Act]." D.C.Code § 1–204.107.

## C. The Initiative Procedures Act

On April 10, 1978, a month after the CAA became effective, the Council introduced implementing legislation as Bill 2–317. D.C. Council, Comm. on Gov't Operations, Report No. 1 on Bill 2–317 at 1 (May 3, 1978) (hereinafter, "IPA Report"). Many of those who testified before the Council on the bill expressed support for a human rights safeguard in the implementing legislation, and the Committee Report notes that, subsequent to the public hearings on the bill, the Council received "myriad telephone calls" in support. IPA Report, at 4–6. Bill 2–317 was reintroduced as Bill 3–2 in January 1979. *Convention Ctr. I*, 399 A.2d at 553; D.C. Council, Comm. on Gov't Operations, Report on Bill 3–2 at 1 (Jan. 31, 1979). The Council approved Bill 3–2, including the Human Rights Act safeguard, as the Initiative, Referendum, and Recall Procedures Act of 1979 (the "IPA"), which became law on June 7, 1979. D.C. Law 3–1, 1979 & 1980 D.C. Stat 7.[9]

## D. The Human Rights Act

In 1973, the pre-Home Rule District of Columbia Council promulgated Title 34 of the District of Columbia Rules and Regulations, known as the "Human Rights Law" (34 DCRR §§ 1.1–35.3 (1973)). Reg. No. 73–22, 20 D.C.Reg. 345 (Nov. 17, 1973). Through the Human Rights Law, the pre-Home Rule Council declared that "[e]very individual shall have an equal opportunity to participate ... in all aspects of life," 34 DCRR § 9.1, and it announced an intent "to secure an end ... to discrimination for any reason other than that of individual merit, including, but not limited to discrimination by reason of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, matriculation, political affiliation, physical handicap, source of income, and place of residence or business." *Id.* § 1.1. The pre-Home Rule Council declared that it was using its "prerogative to legislate broadly," and that the Human Rights Law was intended to be "far-reaching." D.C. Council, Econ. Dev., Labor & Manpower Comm., Report on Title 34 at 2 (August 7, 1973) (hereinafter, "Human Rights Law Report"). The pre-Home Rule Council was explicit that it adopted the Human Rights Law pursuant to its police powers, explaining that Title 34 "shall be deemed an exercise of the police power of the District of Columbia, necessary for the protection of lives, limbs, health, comfort and quiet of all persons and the protection of all property in the District of Columbia." 34 DCRR § 1.3.[10]

---

**9.** The pertinent language of the IPA is set out in note 2 *supra*.

**10.** The pre-Home Rule Council also explained that:

> The District of Columbia Council hereby finds that the failure to provide equal opportunity to enjoy a full and productive life, whether because of discrimination, prejudice, intolerance or inadequate education,

training, housing or health care, not only threatens the rights and proper privileges of its inhabitants, but menaces the institutions and foundations of a free democratic society; and threatens the lives, limbs, health, comfort, quiet of all persons and the protection of all property in the District.

34 DCRR § 1.3.

In enacting the Human Rights Law, the pre-Home Rule Council borrowed the lan-

"Concerned that [the Title 34] police power regulations might not have the same force and effect as a statute, the post-Home Rule Council of the District of Columbia re-enacted the [Human Rights Law] regulations as The Human Rights Act of 1977." *Blodgett v. Univ. Club,* 930 A.2d 210, 217 (D.C.2007). The bill (Bill 2–179) that became the Human Rights Act was introduced on June 16, 1977, within a month after the Council passed the original version of the CAA.[11] D.C. Council, Comm. on Pub. Servs. and Consumer Affairs, Report on Bill 2–179 at 1 (July 5, 1977) (hereinafter, the "Human Rights Act Report"). In reporting the bill, the Committee on Public Services and Consumer Affairs Council explained that, in doing so, it made "no substantive changes," but acted with "the sole effect [of] ... enact[ing] that law as a statute and thus mak[ing] it a permanent part of the District of Columbia Code." *Id.* The Council intended to "reinforce[ ] ... [its] view that the Human Rights Act is among our most important laws and is to be vigorously enforced by all agencies and officials of the District Government." *Id.* It also sought to "underscore the Council's intent that the elimination of discrimination within the District of Columbia should have the highest priority

... and that the Human Rights Act should therefore be read in harmony with and as supplementing other laws of the District." *Id.* at 3. The Council understood that the District's Human Rights Law was "widely hailed as the most comprehensive of its kind in the nation" and sought to put it on "firm legal footing" by re-enacting it as a statute. *Id.* at 2.

The Human Rights Act, which the Council adopted on July 26, 1977, "has remained substantially unchanged since 1977, having been amended only to add new classes to the list of those already protected by the Act." *Blodgett,* 930 A.2d at 218 n. 4. The Act continues to provide that "[e]very individual shall have an equal opportunity to participate ... in all aspects of life, including, but not limited to" those aspects specifically described. D.C.Code § 2–1402.01 (2007). This court has noted that "[t]he Council undoubtedly intended the Human Rights Act to be a powerful, flexible, and far-reaching prohibition against discrimination of many kinds." *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.,* 749 A.2d 724, 732 (D.C.2000).

### III. The Parties' Contentions

 Appellants contend that by refusing to accept their proposed initiative, the

---

guage of a longstanding police regulation that had been enacted by the Commissioners of the District of Columbia pursuant to their authority "to make and enforce all such reasonable and usual police regulations ... as they may deem necessary for the protection of lives, limbs, health, comfort and quiet of all persons and the protection of all property within the District of Columbia." *See Newsweek Magazine v. District of Columbia Comm'n on Human Rights,* 376 A.2d 777, 781–82 (D.C.1977). This court held in *Newsweek* that the Human Rights Law was "a valid exercise of the [pre-Home Rule Council's] police power." *Id.* at 782 n. 4. We explained that "we view the harmful effects of illegal discrimination ... to be so deleterious to our society as to affect the 'lives, limbs, health, comfort and quiet of all persons' within the

District and thus within the purview of ... 'reasonable and usual' Police Regulations." *Id.* at 782.

11. Thus, barely a month after the Council passed the original version of the CAA and before it passed the final version that went to the voters, the Council took action to reinforce the District's far-reaching Human Rights Law. Bill 2–179, which became the Human Rights Act, was sponsored by all thirteen Council members. *See* Memorandum from Anglea B. Howard, Committee on Public Services and Consumer Affairs, to Robert A. Williams at 1 (regarding Substitution of Pages of Committee Report of Bill 2–179, The Human Rights Act of 1977) (July 7, 1977).

Board denied the citizens of the District their "guaranteed right under the District of Columbia Charter to be heard" on the issue of the definition of marriage.[12] In ratifying the CAA, appellants argue, voters conferred upon themselves and all citizens of the District a right to utilize the initiative process with only one limitation—that the initiative process is not available to propose laws appropriating funds (something the parties agree the Marriage Initiative of 2009 does not purport to do). According to appellants, when voters approved the CAA, including its provision requiring the Council to "adopt such acts as are necessary to carry out the purpose of this subpart within 180 days of the effective date of this subpart," D.C.Code § 1–204.107, they authorized the Council only to provide "procedural" rules to facilitate the people's exercise of the right to initiative (and to do so "within 180 days," *id.*). Section 1–204.107 did not, ap-

pellants contend, authorize the Council to "impose additional *substantive* limitations on the people's right of initiative." Thus, appellants say, when the Council enacted the IPA and added the Human Rights Act safeguard, the Council exceeded the authority conferred to it by the CAA. Noting that the Charter Amendments are "in the nature of constitutional provisions," *Convention Ctr. III*, 441 A.2d at 915, appellants emphasize that the CAA "cannot be amended or contravened by ordinary legislation [of the D.C. Council.]" *Id.* ("As implementing legislation, the Initiative Procedures Act is valid, of course, only insofar as it conforms to the underlying Charter Amendments"). Appellants urge us to hold that the Human Rights Act safeguard of the IPA conflicts with the broad right of initiative created by the CAA, and therefore "cannot be used as a basis for disapproving the Marriage Initiative of 2009." [13]

12. Appellants assert that "voters in thirty-one states have participated in the initiative and/or referendum process to voice their opinion on ... the definition of marriage," and urge that the citizens of the District "are also entitled to voice their views through their votes on this important issue."

13. Appellants also assert that citizens of the District may not be subjected to a limit on their ability to propose legislation that diminishes their power relative to that of the Council because, in the process of ratifying the CAA, they "ma[de] themselves coextensive lawmakers with the D.C. Council." For this point, appellants rely heavily on this court's statement in *Atchison v. District of Columbia* that the power of initiative is "coextensive with the power of the legislature to adopt legislative measures." 585 A.2d 150, 155 (D.C.1991) (quoting *Convention Ctr. III*, 441 A.2d at 897). However, the issue in *Atchison* and in *Convention Ctr. III* was whether the initiative process would permit citizens to propose initiatives that were administrative or executive in nature rather than legislative. We answered that question in the negative by explaining that just as the Council's legislative powers do not extend to administrative mat-

ters, "an initiative cannot extend to administrative matters." *Convention Ctr. III*, 441 A.2d at 907. Thus, we held that the voters' legislative power could be no broader than the Council's. *Id.* at 918. We did not consider or address the question raised here, i.e., whether the Council intended to and could lawfully, through the Human Rights Act safeguard, enable citizens to have legislative power that is more limited than the legislative power that the Council itself holds through the Home Rule Act. "It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected but ought not to control the judgment in a subsequent suit when the very point is presented for decision." *Cent. Va. Cmty. College v. Katz*, 546 U.S. 356, 363, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006) (citation and internal quotation marks omitted).

Moreover, what we said in *Convention Ctr. III* was that "*absent express or implied limitation,* the power of the electorate to act by initiative is coextensive with the power of the legislature to adopt legislative measures." 441 A.2d at 897 (italics added); *see also Bri-*

In contrast, the District contends that the CAA "gave the Council the authority to determine what acts were necessary to carry out its purpose, with no provision for review of that determination by this court or any other body." The District argues that, by giving the Council this authority without defining the purpose and without including words of limitation on the types of acts that the Council could enact to carry out that purpose, the CAA "gave the Council authority broader than that necessary to ensure merely that mechanical procedures exist for initiatives to proceed," and established no "judicially manageable standards for determining whether the Council has properly exercised its discretion." As a result, the District asserts, whether the Human Rights Act safeguard is necessary to the purpose of the CAA is a "nonjusticiable political question." The District emphasizes that the Council itself passed the CAA in the same Council session in which it devised the IPA, suggesting that the Council well understood the CAA's purpose as it carried out its mandate to enact necessary implementing law. Thus, the District urges, even if this case is justiciable, under well-established principles of statutory interpretation, this court should presume that the Council acted in conformity with that purpose when it enacted the Human Rights Act safeguard of

the IPA. Therefore, the District maintains, any review of the Council's action "should be highly deferential." The District also stresses that section 752 of the Home Rule Act gave the Council broad "authority to enact any act or resolution with respect to matters involving or relating to elections in the District." D.C.Code § 1–207.52.

## IV. Analysis

### A. The Human Rights Act Safeguard Is Consistent with the Intent of the CAA.

■ We begin our analysis with the observation that, although District citizens' right of initiative is "very broad," *Hessey*, 601 A.2d at 12, it can be no broader than the Council intended when it initiated legislation to share *its* direct legislative authority with the electorate. This is an important point, which reflects the fact that the people's right of initiative in the District is quite different from the right of initiative in other jurisdictions.[14] In other jurisdictions, it is the people who, through state constitutions, have conferred rights on the legislature, but have reserved general legislative power to themselves as well.[15] By contrast, in the District, through section 303 of the Home Rule Act, Congress gave a broad grant of legislative power *to the Council alone* (subject to specified restrictions set out in Title VI,

---

*zill v. District of Columbia Bd. of Elections & Ethics*, 911 A.2d 1212, 1214 (D.C.2006) (Voters "*generally* may approve through initiative any law that the Council may enact through legislation.") (italics added). Thus, rather than answer the question that is before us in this case, the quoted statement begs the question whether there is an express or implied limitation on the right to initiative that is relevant here.

14. For this reason, we have previously cautioned against "equating the initiative right here with initiatives under the simpler governmental structures of the states." *Convention Ctr. III,* 441 A.2d at 917.

15. *See, e.g., McGee v. Sec'y of State,* 896 A.2d 933, 941 (Me.2006) ("By section 18 the people, as sovereign, have retaken unto themselves legislative power and that constitutional provision must be liberally construed to facilitate, rather than to handicap, the people's exercise of their sovereign power to legislate.") (citation omitted); *Gallivan v. Walker,* 54 P.3d 1069, 1080 (Utah 2002) ("Article VI, section 1 [of the Utah constitution] is not merely a grant of the right to directly legislate, but reserves and guarantees the initiative power to the people.") (italics omitted).

including Congress's power to disapprove Council legislation). In passing the CAA, the Council had to decide the extent of the legislative power it would share with the people.[16] Thus, to resolve the issue that is before us, the Council's intent when it passed the CAA is paramount.[17] *Cf. Stevenson v. District of Columbia Bd. of Elections & Ethics*, 683 A.2d 1371, 1376 (D.C. 1996) (reasoning that ambiguous language in the CAA must be read in a way that expresses the Council's intent and rejecting the "premise that the bill as enacted meant something different from the bill the Council intended").

## 1. The Human Rights Act Safeguard Is Not Inconsistent with the Relevant Language of the CAA, Which is Ambiguous.

### a. The Definition of "Initiative"

█ The words used in a statute "are the primary, and ordinarily the most reliable, source of interpreting the meaning" of the statute. *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 454–55, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989); *Brizill*, 911 A.2d at 1216 n. 8 ("The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used"). Thus, in our effort to determine the Council's intent, we turn first to the language of the CAA. As already described, the definitional section of the CAA defines the term

"initiative" as "the process by which the electors of the District of Columbia may propose laws (except laws appropriating funds) and present such proposed laws directly to the registered qualified electors of the District of Columbia for their approval or disapproval." *Id.* § 1–204.101(a). This is the language on which appellants focus primarily, arguing that the "except laws appropriating funds" phrase is "the exclusive substantive limitation" on the right to initiate legislation.

Although on its face this language may appear to denote that there is but one limit on use of the initiative process, the context shows that this is not the case. The Charter amendment that established the right to initiative must be read in conjunction with the Home Rule Act, which, although conferring on the Council broad legislative authority, makes clear that the legislative authority is subject to limits implied by the United States Constitution and to the enumerated limits on that legislative authority that Congress set out in Title VI of the Home Rule Act. *See* D.C.Code §§ 1–203.02, 1–206.02; *Convention Ctr. III*, 441 A.2d at 918 (explaining that voters' power to legislate by initiative can be no broader than the Council's legislative power). Since section 1–204.101(a) obviously could not and did not remove those limits, it cannot be read as expressing the entire scope of restrictions on the initiative right.

---

16. As this discussion implies, there is no *federal* constitutional right to initiative. *See Molinari v. Bloomberg*, 564 F.3d 587, 597 (2d Cir.2009) ("[T]he right to pass legislation through a referendum is a state-created right not guaranteed by the U.S. Constitution."); *Marijuana Policy Project v. United States*, 304 F.3d 82, 87 (D.C.Cir.2002) (Congress could "repeal the [District's] initiative process altogether").

17. The task before us is therefore fundamentally different from the task we faced in *District of Columbia v. Wash. Home Ownership Council, Inc.*, 415 A.2d 1349 (D.C.1980) (en banc), where we recognized that, while the "Council's interpretation of its own authority [under the Home Rule Act, which was passed by Congress, not the Council] obviously commands great respect, ... [it is not] entitled to weight beyond the inherent persuasiveness of the position taken in a particular instance." *Id.* at 1351 n. 5.

Rather, section 1–204.101—which Congress recognized as merely "defin[ing] the operative terms" of the CAA[18]—does not purport to address, and is ambiguous as to, whether there are other limitations on the right to initiative (and referendum).[19] The Human Rights Act safeguard is not inconsistent with that ambiguous language.[20]

**18.** H.R.Rep. No. 95–891, at 15.

**19.** Appellants rely on the ballot language that voters saw and approved as indicative of the "plain" meaning of the CAA. We reject this argument. Appellants are correct that the ballot language did not tell voters that the initiative process could be limited. But neither did the ballot language inform voters about the appropriations restriction expressly stated in the CAA, or about the enumerated limitations on legislative authority set out in Title VI of the Home Rule Act, or about the restrictions implied by the U.S. Constitution. The ballot read:

> *The Initiative and Referendum Charter Amendment*
>
> Authorizes 5% or more of the city's registered voters (with 5% from each of at least 5 city wards) to propose laws and enact them by public vote or to repeal laws previously enacted by the Council of the District of Columbia by petitioning the Board of Elections and Ethics to conduct a public vote for such purposes. The Board of Elections and Ethics shall place such proposals on the ballot for approval or rejection.
>
> The above would not go into effect until October 1, 1978.

Thus, the ballot asked voters to approve creation of the right to legislate by initiative, but did not ask them to vote as to the scope of the initiative power.

**20.** The Superior Court addressed at some length appellants' argument that "[t]he expression of only one subject-matter exclusion, indicates that all other subjects are proper for initiatives." Order Granting District of Columbia's Motion for Summary Judgment and Denying Petitioners' Motion for Summary Judgment, at 6 (Jan. 14, 2010) (hereinafter, "Superior Court Order"). As the court recognized, appellants' argument appears to apply the interpretive canon *"expressio unius est exclusio alterius." Id.* at 10. As both the Supreme Court and this court have explained, however, that canon "is an aid to construction, not a rule of law." *Howard Univ. Hosp. v. District of Columbia Dep't of Emp't Servs.,* 952 A.2d 168, 175 (D.C.2008) (quoting *Neuberger v. Comm'r of Internal Revenue,* 311 U.S. 83, 88, 61 S.Ct. 97, 85 L.Ed. 58 (1940) (internal quotation marks omitted)). More to the point, as the Superior Court explained in its ruling, the canon "depends on identifying a series of two or more terms or things that should be understood to go hand in hand, which [is] abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded." Superior Court Order at 11 (quoting *Chevron U.S.A., Inc. v. Echazabal,* 536 U.S. 73, 81, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002)). Here, the canon does not support appellants' argument. Section 1–204.101 sets out, via the expressed exceptions to the definitions of "initiative" and "referendum," a list of *subject areas* that the Council meant to render off-limits to direct democracy: appropriations, emergency acts, tax levies, the District's budget. No inference can sensibly be drawn that by listing these subject areas and no others, the Council intended that the initiative and referendum process would be otherwise unfettered, i.e. subject to no non-subject-matter safeguards and restrictions. *Cf. Convention Ctr. I,* 399 A.2d at 553 & n. 8 (recognizing that, without implementing legislation, the CAA did not "provide sufficient safeguards" against abuse, and relying in part on the Board's statement that "safeguards that modern voters have come to view as essential" were absent from the CAA).

And, quite the contrary, during the Council debate upon the second reading of the CAA, Council Chair Tucker, to expedite a final vote on the legislation, assured Council members that the matter of safeguards (including, as Councilmember Wilson put it, provisions to "protect the citizens against special interests," and possibly, as Councilmember Shackleton thought necessary, referendum expenditure limits) would be addressed and debated in connection with implementing legislation to follow. Final Reading of Bill 2–2, "The Initiative, Referendum, and Recall Charter Amendments of 1977," at 15, 1619 (May 17, 1977); First Reading of Bill 2–2, "The Initiative, Referendum, and Recall Charter Amendments of 1977," at 37 (May 3, 1977).

### b. The Council's Authority to "adopt acts as are necessary to carry out the purpose" of the CAA

The other relevant language of the CAA is section 1–204.107, the CAA provision that directed the Council to "adopt such acts as are necessary to carry out the purpose of this subpart within 180 days." [21] This language is in marked contrast to the counterpart language used in the bill that Councilmember Hobson introduced on January 3, 1977 (Bill 2–2, which, as amended, became the CAA). Bill 2–2 directed that "[t]he Council of the District of Columbia shall provide the manner in which petitions shall be circulated, presented and certified and measures submitted to the electors." *See* D.C. Council, Comm. on Gov't Operations, Report No. 1 on Bill 2–2 at Attachment A 4 (March 16, 1977) (hereinafter, "CAA Report"). The CAA "necessary to carry out the purpose" language also is in stark contrast to the language used in the bills that were introduced in Congress (bills that culminated in passage of the Home Rule Act) that would have created a right to initiative and mandated the Board (not the elected Council)

to "prescribe such regulations as may be necessary or appropriate (1) with respect to the form, filing, examination, amendment, and certification of initiative petitions, and (2) with respect to the conduct of any election during which any such petition is considered." Hearing on S. 1603 and S. 1626, 92d Cong.163. Similarly, the CAA language contrasts with the language used in section 303(c) of the Home Rule Act, which also afforded the Council a model it might have used to declare its authority to enact merely procedural rules governing the initiative and referendum process. *See* D.C.Code § 1–203.03(c) (2006) ("The Board of Elections and Ethics shall prescribe such rules as are necessary with respect to the distribution and signing of petitions and the holding of elections for ratifying amendments to subchapter IV of this chapter according to the procedures specified in subsection (a) of this section"). By comparison to all of those formulations, the "necessary to carry out the purpose" language that the Council used in section 1–204.107 appears to be purposefully undefined.[22] Notably, in oth-

---

**21.** Emphasizing this language, appellants cite to cases from other jurisdictions in which courts, construing language directing the legislature to enact legislation to implement initiative or referendum provisions, have ruled that the legislature could impose only procedural rules, not additional substantive restrictions. We do not find these cases helpful, because none of them involved the broad "necessary to carry out the purpose" language used in the CAA. Further, the cases generally involve state constitutional provisions that (unlike the CAA) are self-executing, such that all that is left to the legislature is to specify the form of the referendum or initiative petition, *see, e.g., Loonan v. Woodley*, 882 P.2d 1380, 1386 (Colo.1994) (applying Colo. Const. art. V, § 1(10)); and, in many jurisdictions, involve provisions that specifically direct the legislature to enact laws to "facilitate . . . operation" of the initiative process and/or specifically provide that "no legislation shall be enacted to restrict the right of initiative."

*See, e.g., Cobb v. Burress*, 213 Ark. 177, 209 S.W.2d 694, 697 (1948) (explaining that because the state constitution provides that "laws may be enacted to facilitate" the right of referendum and further provides that "[n]o legislation shall be enacted to restrict, hamper or impair the exercise of the rights herein reserved to the people," the General Assembly's attempt to limit the time within which a referendum petition might be filed was beyond the power of the legislature and therefore was void).

**22.** Indeed, from the language of section 1–204.107, it appears that, rather than resolve the issue of whether to express in the CAA any additional restrictions on the right to initiative and referendum, the Council decided to "evade that point and establish a legislative construction of the [Charter amendment]." *Myers v. United States*, 272 U.S. 52, 113, 47 S.Ct. 21, 71 L.Ed. 160 (1926).

er contexts, virtually identical language has been used to authorize the adoption not only of procedural rules, but also of substantive requirements. *See, e.g., District of Columbia Ins. Placement Facility v. Washington*, 269 A.2d 45, 48–49 (D.C. 1970) (noting that statute that directed the Superintendent of Insurance to promulgate such regulations as "he shall deem necessary to carry out the purposes" of the statute authorized the Superintendent to direct that insurance placement facilities issue crime insurance).[23] The fact that section 1–204.107 placed no express limit mandating that the CAA-implementing legislation must be procedural only may be taken as "a convincing indication that none [i.e., no such limit] was intended." *Myers*, 272 U.S. at 128, 47 S.Ct. 21.[24] At the very least, section 1–204.107 is ambiguous as to whether it authorized the Council to adopt additional restrictions or limitations on use of the initiative process.

That being the case, the additional "restriction" that the Council imposed through the Human Rights Act safeguard is not manifestly contrary to the "acts as are necessary to carry out the purpose" language of section 1–204.107.

Focusing more particularly on the word "purpose" in the "necessary to carry out the purpose" clause of section 1–204.107, appellants argue that the sole purpose of the CAA was to establish the right of initiative and referendum and that, by authorizing the Council to enact legislation to carry out that purpose, the CAA must be understood to have authorized the Council to do no more than to adopt rules to facilitate citizens' use of the new power. However, they cite no support for their view that the CAA referred only to this mechanical purpose rather than to the concerns and objectives that motivated the Council to pass the act that became the CAA.[25] We deem it significant that the

**23.** The "necessary to carry out the purpose" language of section 1–204.107 also is strikingly similar to the "Necessary and Proper" clause of Article I, section 8, cl. 18 of the Constitution, which the Supreme Court has construed as broadening the power of Congress. *See, e.g., United States v. Comstock*, —— U.S. ——, 130 S.Ct. 1949, 1956–59, 176 L.Ed.2d 878 (2010) (explaining that the "Necessary and Proper" clause grants Congress power to "make all Laws which shall be necessary and proper for carrying into Execution" the enumerated powers vested in Congress, "grants Congress broad authority to enact federal legislation" that goes beyond what is described specifically in the list of enumerated powers); *McCulloch v. Maryland*, 17 U.S. 316, 420, 4 Wheat 316, 4 L.Ed. 579 (1819) (concluding that if the "Necessary and Proper" clause "does not enlarge, it cannot be construed to restrain the powers of [C]ongress, or to impair the right of the legislature to exercise its best judgment in the selection of measures to carry into execution the constitutional powers of the government").

**24.** Additionally, the fact that in the CAA the Council reserved to itself the task of adopting

implementing rules, rather than assign that responsibility to the Board, suggests that the Council contemplated that deciding on the rules "necessary to carry out the purpose" of the CAA could entail a balancing of policy considerations that was more suited to legislative resolution than to administrative decision-making. In commenting on the bill that became the CAA, the Board sought "a general grant of rulemaking authority *to carry out the processes* if approved by the voters." CAA Report, at 3; H.R.Rep. No. 95–890, at 9 (italics added); H.R.Rep. No. 95–891, at 8 (italics added). By contrast, as enacted by the Council, the CAA directs the Council to adopt such acts as are necessary *"to carry out the purpose"* of the CAA. The difference in language is striking. *See also* D.C.Code § 1–1021.02 (2006) (IPA provision that directed the Board to "issue rules and regulations *to effect the provisions of"* the IPA) (italics added).

**25.** Our dissenting colleagues refer to the preamble to the CAA as printed in the D.C. Statutes-at-Large ("To amend the Charter of the District of Columbia to provide for the power of initiative, referendum, and recall," 1978 D.C. Stat. 33) and argue that this re-

CAA Report refers to the initiative, referendum, and recall processes as "legacies of the Progressive Era in American politics" that are designed "to provide direct and continual accountability of public officials to the electorate." CAA Report, at 2; *see also* H.R.Rep. No. 95–890, at 8 (containing the same explanation).[26] If this is the broad purpose of the CAA, the Council could reasonably have thought, for example, that it was necessary to that purpose—i.e., the purpose of helping to ensure that the Council was accountable to the entire electorate—for the Council to disallow use of the initiative or referendum process to enact legislation that would have the effect of discriminating against sectors of the electorate who might need protection from the "major forms of discrimination currently encountered by citizens." [27] Human Rights Law Report, at 1 (describing the target of the Human Rights Law).

That said, we agree with the District that our role is not to second-guess the Council's judgment and to decide whether there is a sufficiently strong connection

solves "any mystery about the purpose of the CAA." They do not discuss the preamble to the Human Rights Act as printed in the D.C. Statutes–at–Large: "To enact Regulation 73–22, A Regulation Governing Human Rights." D.C. Law 2–38, 1977 D.C. Stat. 461. The discussion *supra* documents that the Council had a much more expansive purpose in mind in enacting the Human Rights Act, including to "underscore the Council's intent that the elimination of discrimination within the District of Columbia should have the highest priority ... and that the Human Rights Act should therefore be read in harmony with and as supplementing other laws of the District." Human Rights Act Report, at 3. Just as the brief preamble to the Human Rights Act does not disclose this broader purpose, there is no reason to treat the brief preamble to the CAA as disclosing the Council's full purpose.

**26.** That this was a purpose that the Council likely had in mind when it passed the CAA also is suggested by the legislative history of the Home Rule Act, in which there were discussions of the initiative, referendum and recall processes as means of assuring that elected officials remained responsive to the electorate. *See, e.g.,* Hearings before the Subcommittee on Government Operations of the Committee on the District of Columbia, 93d Cong.11 (1978) (statement explaining that there was probably no need for these powers since Council members would be made "additionally responsive" by their then-proposed two-year terms and since there would continue to be "Federal Government oversight" and "the continual restraining effect of the federal presence").

**27.** Indeed, such reasoning appears to be implicit in the Council's reference, in the IPA Report, to Justice Douglas's concurrence in *Reitman v. Mulkey*, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). The Committee on Government Operations quoted Justice Douglas's statement (which itself quoted the writings of James Madison) about the need to protect minorities "from acts in which the Government is the mere instrument of the major number of the Constituents." *Id.* at 387, 87 S.Ct. 1627 (Douglas, J., concurring) (citation and internal quotation marks omitted). IPA Report, at 11. And, during the Council debate upon the first reading of the IPA, Councilmember Wilson, for one, expressed concern about how "this government [can] make decisions that are in the best interest of a whole" without being "accuse[d] ... of not wanting to allow people to vote." First Reading of Bill 3–2, "Initiative, Referendum, and Recall Procedures Act of 1979," at 43 (Mar. 13, 1979).

Implicit in our statement that the Council could reasonably have thought that the Human Rights Act safeguard of the IPA was necessary to carry out the purpose of the CAA is the point that, if we could conceive no rational connection between the purpose of the CAA and the Human Rights Act safeguard, we would have a basis for concluding that this provision of the IPA falls outside the authority conferred by the CAA. The same would be true if we concluded that the Human Rights Act safeguard conflicts with the language of the CAA. Thus, we reject the District's argument that the issue presented in this appeal is a nonjusticiable political question for lack of any judicially manageable standard.

between the purpose of the CAA and the Human Rights Act safeguard. The "degree of [the safeguard's] necessity, the extent to which [it] conduce[s] to the end, the closeness of the relationship between the means adopted and the end to be attained, [were] matters for [the legislature's] determination alone." *Comstock*, 130 S.Ct. at 1957. To be "necessary to carry out the purpose" of the CAA, it was not required that the Human Rights Act safeguard be absolutely necessary to enable the initiative and referenda processes to be launched.[28] To conclude that the Human Rights Act safeguard is not inconsistent with the CAA, it is enough that we can conclude (as we do) that, on its face, the Human Rights Act safeguard is not manifestly contrary to the "purpose" of the CAA.

In short, analysis of the text of the CAA does not enable us to agree with appellants that the Council contravened the express language of the CAA in enacting the Human Rights Act safeguard. And, quite the contrary, other factors persuade us that the Council acted in a manner consistent with its intent when it passed the CAA.

## 2. The Council's Interpretation of the CAA, Which is Reflected in the IPA Human Rights Act Safeguard, Is Entitled to Substantial Deference.

Although the language of the CAA does not tell us whether the Council intended that the CAA-implementing legislation could set out additional limitations on the right to initiative, what the Council did in enacting the IPA provides an authoritative interpretation of the intent and meaning of the CAA. This follows from the principle that "a contemporaneous legislative exposition of the Constitution [or, by analogy, the Charter Amendments] when the ... framers ... were actively participating in public affairs, acquiesced in for a long term of years, fixes the construction to be given [the Constitution's] provisions." *Eldred v. Ashcroft*, 537 U.S. 186, 213, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003) (quoting *Myers*, 272 U.S. at 175, 47 S.Ct. 21); *see also Printz v. United States*, 521 U.S. 898, 905, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) ("[E]arly congressional enactments provide contemporaneous and weighty evidence of the Constitution's meaning[.]") (citations and internal quotation marks omitted). The principle that the Supreme Court re-affirmed in *Eldred* is squarely applicable here, because the Council that authored and, in April 1978, began consideration of the bill that became the IPA was largely the same Council that passed the CAA in May 1977.[29] We agree with the

---

28. *Id.* at 1956 (explaining that in the "Necessary and Proper" Clause, "necessary" does not mean "absolutely necessary"; rather, the clause gave Congress "power to enact laws that are 'convenient, or useful' or 'conducive' to the authority's 'beneficial exercise' "); *accord McCulloch*, 17 U.S. at 413–14 (" '[N]ecessary' frequently imports no more than that one thing is convenient, or useful, or essential to another. To employ the means necessary to an end, is generally understood as employing any means calculated to produce the end, and not as being confined to those single means, without which the end would be entirely unattainable."); *id.* at 415 ("The subject [of the "Necessary and Proper" Clause] is the execution of those great powers on which the

welfare of a nation essentially depends. It must have been the intention of those who gave these powers, to insure ... their beneficial execution. This could not be done, by confiding the choice of means to such narrow limits as not to leave it in the power of [C]ongress to adopt any which might be appropriate, and which were conducive to the end").

29. Ten of the thirteen Council members who voted in favor of the CAA were still on the Council when the IPA was passed in March 1979, and all ten voted in favor of enactment; an eleventh, Marion Barry, was still on the Council when the bill that became the IPA was introduced in April 1978, and later, as then-Mayor, signed the IPA into law.

District that these facts—i.e., the passage of the IPA by Council members who also were the "framers" of the Charter Amendments, and the near-contemporaneity of their work on first the CAA and then the IPA—dictate that we accord substantial deference to the Council's "legislative construction"[30] of the CAA as expressed in the IPA, which was intended to implement the CAA.[31]

That is not to say that we must accept any provision that the Council enacted as part of the IPA; we have not hesitated to strike down a provision of the IPA where it squarely conflicted with a provision of the CAA. *See Price v. District of Columbia Bd. of Elections & Ethics*, 645 A.2d 594, 596–99 (D.C.1994) (striking down IPA provision that required the Board to use the November 1989 voter registration roll to calculate the number of signatures required for an initiative or referendum petition where the specific terms of the CAA required use of the December 1993 voter registration roll, because "to the extent any IPA provision is inconsistent with the

Charter Amendments, the latter controls"); *see also INS v. Chadha*, 462 U.S. 919, 944, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (explaining that longstanding acceptance will not "save [a practice] if it is contrary to the Constitution"). But where, as here, the relevant CAA provisions admit of more than one meaning, the Council's legislative construction of those provisions when it drafted the IPA less than a year after it passed the CAA is entitled to substantial weight. *Myers*, 272 U.S. at 113, 174–75, 47 S.Ct. 21.[32] Thus, we must begin with a presumption that the Human Rights Act safeguard that the Council enacted as part of the IPA is consistent with the CAA.

That there was more than one possible interpretation of the relevant provisions of the CAA was made evident at the outset, when, during the debate on the IPA, both the Corporation Counsel and the General Counsel to the Council advised that the Council did not have the power to impose the Human Rights Act safeguard.[33] But

---

30. *Myers*, 272 U.S. at 113, 47 S.Ct. 21.

31. *Cf. Winters v. Ridley*, 596 A.2d 569, 572, 577 (D.C.1991) (Schwelb, J., concurring) (discussing whether an inmate's "good time credit" accumulated pursuant to the "Good Time Credits Act" ("GTCA") passed in 1986 could be applied to reduce the inmate's mandatory minimum sentence for first-degree murder; observing that ten of the thirteen members of the Council who passed the GTCA were also members of the Council in 1989; and reasoning that the Council's unanimous passage in 1989 of a resolution and legislation declaring that the GTCA was not intended to affect mandatory minimum sentences imposed for first-degree murder was "surely revealing as to what the 1986 Council intended to accomplish" through the GTCA and "provide[d] persuasive evidence of [the Council's] intent in 1986 .... [i]n the absence of evidence that the members of the Council were mistaken, or worse, about what they initially intended").

32. *See also Winters*, 596 A.2d at 578 (Schwelb, J., concurring) ("The views of a

subsequent legislature are not conclusive as to the intent of an earlier one, but they carry 'considerable retrospective weight.' ") (quoting *Heckler v. Turner*, 470 U.S. 184, 211, 105 S.Ct. 1138, 84 L.Ed.2d 138 (1985)); *Stevenson*, 683 A.2d at 1376 (observing that "the legislative history both at the time of enactment *and afterwards* ... points unmistakably to the Council's intent" in enacting the "5 percent" language of the CAA) (italics added).

33. For example, the Office of Corporation Counsel opined that "[a]ny substantive restrictions on the rights of the voters ... are contrary to [the CAA] and, hence, are void and of no effect," Supplemental Memorandum from Louis P. Robbins, Principal Deputy Corporation Counsel, Office of the Corporation Counsel to Judith W. Rogers, Special Assistant for Legislation, at 2 (June 2, 1978) (3 Op. C.C.D.C. 102, 103 (1978)); *see also* Memorandum from Edward B. Webb, Jr., General Counsel to Council Members, at 2 (June 7, 1978) (opining that the Human Rights Act safeguard "engrafts ... a new re-

the elected representatives of the people—the Council and the Mayor—thought otherwise. Importantly, it was the Council members, not the lawyers, who were privy to the full panoply of discussions, conferences, and considerations that led to adoption of the CAA, and who had the authority to propose and vote on the IPA. It is their understanding that informs our analysis.[34] An observation by the Supreme Court in *Myers* is instructive. The issue before the Court in that case was whether "under the Constitution the President has the exclusive power of removing executive officers of the United States whom he has appointed by and with the advice and consent of the Senate." 272 U.S. at 106, 47 S.Ct. 21. The Court noted that the First Congress had decided the issue—i.e., had "early adopted as the practical construction of the Constitution that this power was vested in the President alone[,]" *id.* at 153, 47 S.Ct. 21—"within two years after the Constitutional Convention and within a much shorter time after its ratification[,]" and while "number[ing] among its leaders those who had been members of the Convention." *Id.* at 136, 47 S.Ct. 21. Regarding the First Congress's decision, the Supreme Court observed that "[i]t was of course to be expected that the decision would be received by lawyers and jurists with something of the same division of opinion as that manifested in Congress, and doubts were often expressed as to its correctness." *Id.* Nevertheless, the Court observed, "the acquiescence which was

promptly accorded [the First Congress's interpretation] after a few years was universally recognized." *Id.* "[T]he decision of Congress in 1789 and the universal practice of the Government under it, had settled the question beyond any power of alteration." *Id.* at 146, 47 S.Ct. 21 (quoting *Parsons v. United States,* 167 U.S. 324, 330, 17 S.Ct. 880, 42 L.Ed. 185 (1897)). So, here, the doubts expressed by lawyers who had neither the authority to enact the CAA nor were answerable to the electorate do not undermine our reliance on the Council's interpretation (as reflected in IPA) of language in the CAA that can bear more than one meaning.

### 3. We Accept the Council's Interpretation of the CAA As Reflected in the IPA Because It Is Consistent with the Concerns and Objectives That the Council Contemporaneously Emphasized as Having the "Highest Priority."

The District of Columbia Charter is a "constitutional analog." *Wash. Home Ownership Council,* 415 A.2d at 1367 (Gallagher, J., concurring) (internal quotation marks omitted). As the Supreme Court reasoned long ago in *Myers,* in determining ultimately whether to accept the legislature's near-contemporaneous construction of an ambiguous constitutional provision, it is important to understand the context in which the framers did their work and the concerns that animated them.[35] Accordingly, we look to the con-

---

quirement not in the Charter amendment" and represents "an indirect attempt to further amend the Charter and is, therefore, legally without effect").

**34.** And, although a few Council members questioned whether the IPA restriction on referenda dealing with *any* budget item (including capital budget items) comported with the CAA, *see* Second Reading of Bill 3–2, "Initiative, Referendum, and Recall Procedures Act of 1979," Excerpt at 710, 15 (Mar. 27, 1979),

we see no evidence that any Council member thought that the Human Rights Act safeguard contravened the CAA. Thus, we see "no cause to suspect that a purpose to evade" the CAA mandate prompted the Council to adopt the Human Rights Act safeguard. *Eldred,* 537 U.S. at 199–200, 123 S.Ct. 769.

**35.** The particular facts discussed in *Myers* again are instructive. The opinion recounts that under the Articles of Confederation, the states' union "had not worked well," in part

text in which the Council passed the CAA (both the original version of the CAA and the revised version that was put to voters in November 1977) and the broader legislative agenda and objectives that motivated Council members at the time.

Almost immediately after passage of the original version of the CAA in May 1977, the Council turned its efforts toward introducing and passing (on July 26, 1977) a bill that re-enacted the Human Rights Law as the Human Rights Act of 1977.[36] As described above, the Council explained that it intended the re-enactment to "forcefully convey to the executive and administrative agencies of the District Government the importance which the Council places on vig[o]rous enforcement of its provisions" and to reinforce and underscore the Council's intent that the District's human rights law be given the "highest priority" and "be read in harmony with and as supplementing other laws of the District." Human Rights Act Report, at 3. The Council emphasized, *inter alia*, its objective to reinforce the principle that the Human Rights Law was intended as a supplement to every District licensing and benefit scheme— to make it "unequivocally clear, for example, that a licensed establishment which has been found to discriminate in violation of the Act, could have its license suspended, revoked, or otherwise restricted for that reason." *Id.*[37] The Council explained,

because there was no strong Executive; rather, Congress was given the power of appointing certain executive officers and also exercised the power of removal. *See* 272 U.S. at 110, 116, 47 S.Ct. 21. "The debates in the Constitutional Convention indicated an intention to create a strong Executive" and to specify "many of his important functions ... so as to avoid the humiliating weakness of the Congress during the Revolution and under the Articles of Confederation." *Id.* at 116–17, 47 S.Ct. 21 (citation omitted). Nevertheless, the Constitution does not specify that the President may act alone to remove officials whose terms are not specified. The First Congress, however, passed laws that reflected its "legislative construction" that the President does have the power of removal of officers appointed with the advice and consent of the Senate. *Id.* at 113, 153, 47 S.Ct. 21. The Court's opinion makes clear that it accepted that legislative construction, by members of the First Congress who were among the framers of the Constitution, because the interpretation was consistent with the concerns and objectives that guided the framers. *Id.* at 115–37, 164, 47 S.Ct. 21 (setting out various statements by members of the First Congress, and concurring in the interpretation that carried the day, because "to hold otherwise would make it impossible for the President, in case of political or other differences with the Senate or Congress," to act as a strong Executive).

**36.** The Mayor signed the Human Rights Act into law on September 28, 1977.

**37.** Both the Human Rights Law and the Human Rights Act contained language nearly identical to the following current provision of the Act:

(a) Whenever it appears that the holder of a permit, license, franchise, benefit, or advantage issued by any agency or authority of the government of the District is a person against whom the Office has made a finding of probable cause [that the holder is violating the Human Rights Act] pursuant to § 2–1403.05, the Office, notwithstanding any other action it may take or may have taken under the authority of the provisions of this chapter, may refer to the proper agency or authority the facts and identities of all persons involved in the complaint for such action as such agency or authority, in its judgment, considers appropriate, based upon the facts thus disclosed to it.

(b) The Commission, upon a determination of a violation of any of the provisions of this chapter by a holder of, or applicant for any permit, license, franchise, benefit, exemption, or advantage issued by or on behalf of the government of the District of Columbia, and upon failure of the respondent to correct the unlawful discriminatory practice and comply with its order, in accordance with § 2–1403.15(a), shall refer this determination to the appropriate agen-

too, that it was taking action in the wake of *Newsweek*, 376 A.2d 777, a decision of this court issued on March 28, 1977, and an earlier decision from 1974,[38] that called into question the District government's powers to enforce some of the remedies provided in the Human Rights Law, which had been promulgated by the pre-Home Rule Council (under its more limited powers) as a regulation rather than a statute. Human Rights Act Report, at 2. During the Council discussion of the bill upon its final reading, Councilmember Barry urged the Council to "go on record as carrying out our progressive tradition in this city of being in the forefront of human rights," and to make the District's human rights law "as broad and as sweeping as we possibly can," to eliminate discrimination "under any guises." Final Reading of Bill 2–179, "The Human Rights Act of 1977," at 75 (July 26, 1977). Councilmember Rolark explained that she co-sponsored the bill because she "kn[e]w how hard that fight has been to obtain human rights in the District of Columbia for all of us and I do underscore 'all.'" *Id.* at 76.

▇▇▇ We believe it is reasonable to assume that the Council did not come by these strong views only in June 1977

(when the bill that became the Human Rights Act was introduced), and that Council members held these views as they passed the original version of the CAA the previous month, in May 1977. And, in any event, the Council had forcefully articulated these views before it passed the amended version of the CAA (on November 1, 1977) that was presented to voters. This history and the strong language that the Council used when it re-enacted the District's human rights law (and when it included the Human Rights Act safeguard in the bill that the Council Committee on Government Operations reported to implement the CAA) inform our analysis. In light of them, we find it inconceivable that the Council would have intended to permit individuals to use the initiative process to circumvent the human rights law, which the Council had just affirmed had the "highest priority," Human Rights Act Report, at 3, and which, we have recognized, "was enacted to aid ... the public at large." *JBG Props., Inc. v. District of Columbia Office of Human Rights*, 364 A.2d 1183, 1185 (D.C.1976).[39] For this reason, we are persuaded that the Council would have understood the human rights law as "supplementing" the CAA, Human Rights Act Report, at 3, and as an implied

cy or authority. Such determination shall constitute prima facie evidence that the respondent, with respect to the particular business in which the violation was found, is not operating in the public interest. Such agency or authority shall, upon notification, issue to said holder or applicant an order to show cause why such privileges related to that business should not be revoked, suspended, denied or otherwise restricted.

D.C.Code § 2–1403.17(a), (b) (2007).

**38.** *Mendota Apartments v. District of Columbia Comm'n on Human Rights*, 315 A.2d 832, 833, 834, 835 (D.C.1974) (upholding Commission on Human Rights order that petitioner cease and desist from racial discrimination in the rental of apartments ("refusing to lease an

apartment to [complainant] because she is a Negro"), but concluding that the Commission did not have authority to award damages to compensate complainant for the anguish and humiliation suffered because of petitioner's discriminatory practices, since that was beyond the scope of reasonable and usual police regulations).

**39.** *Cf. Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 552, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) ("We agree with the Secretary that [i]t is inconceivable that Congress intended to allow either the State of Alaska or Native Alaskans to select [i.e., own] portions of the [Outer Continental Shelf]—a vital national resource reserve held by the [government] for the public.") (citation and internal quotation marks omitted).

limitation on the initiative and referendum prerogative (in a manner similar to the way in which the District's human rights law was and is a limitation implied in the various "permit, license, franchise, benefit, [and] advantage" schemes administered by agencies of the District government. D.C.Code § 2–1403.17(a)).[40] *See* IPA Report, at 10 ("It is [an] implied restriction to ensure that no initiated measure will establish an affirmative policy in favor of discrimination in this community"). Stated differently, we are persuaded that the Council would have viewed the CAA as permitting citizens to place initiatives and referenda on the ballot only insofar as consistent with the District's human rights law (and that, by broadly describing its mandate to adopt "acts as are necessary to carry out the purpose" of the CAA, the Council left the door open for the IPA to incorporate explicitly that human rights safeguard).[41] "[T]o hold otherwise" would be to conclude that the Council intended to confer an initiative right that could "make it impossible[,]" *Myers*, 272 U.S. at 164, 47 S.Ct. 21, to achieve the Human Rights Act

objectives that the Council emphasized had the highest priority.

Our recognition of this implied Human Rights Act safeguard does not portend a dilution of the important right of the electorate to propose laws. In the thirty-plus years since passage of the IPA, the Council has never attempted to impose any further legislative limitation on the right to initiative or referendum. The fact that it has not done so weighs heavily against the possibility that any further restrictions on the right of initiative are implied in the CAA.[42]

The legislative history of the IPA reflects that when the Council set about crafting provisions to carry out the purposes of the CAA, it focused on the Supreme Court's opinion in *Reitman*, which the Committee on Government Operations Report discussed in some detail. IPA Report, at 9–11. In *Reitman*, the Supreme Court affirmed a ruling of the Supreme Court of California striking down, as violative of the Equal Protection Clause of the Fourteenth Amendment, Proposition 14,

**40.** *See also Filippo v. Real Estate Comm'n of the District of Columbia*, 223 A.2d 268, 269, 270 (D.C.1966) (upholding order of Real Estate Commission suspending petitioner's real estate broker's license on ground that he "exhibit[ed] and offer[ed] for sale a house ... to Negroes at a higher price than the same house was exhibited and offered for sale to white persons[,]" in violation of the police regulations prohibiting, *inter alia*, discrimination for reasons of race).

**41.** It may be asked why, then, did the Council not state a human rights restriction in the CAA. We addressed a similar question in *Atchison*, where the issue was whether the Council's failure to include in the CAA a provision that would have granted the Council the express power to amend or repeal an initiative act meant that the Council had no such power. 585 A.2d at 154. We cited the Supreme Court's observation in *United States v. Wells Fargo Bank*, 485 U.S. 351, 358, 108

S.Ct. 1179, 99 L.Ed.2d 368 (1988), about Congress's failure to include a particular provision in a tax bill: "Equally plausible is that the Committee omitted the express exception as unnecessary." *Atchison*, 585 A.2d at 156.

**42.** *Cf. Printz*, 521 U.S. at 907–08, 117 S.Ct. 2365 ("[W]e do not think the early statutes imposing obligations on state courts imply a power of Congress to impress the state executive into its service. Indeed, it can be argued that the numerousness of these statutes, contrasted with the utter lack of statutes imposing obligations on the States' executive ... suggests an assumed absence of such power.") (italics omitted). Similarly, the fact that the Council, acting within (and somewhat beyond) the 180–day legislative period described in the CAA, identified no additional limitations as necessary to carry out the purpose of the CAA, presumably would weigh against a finding that additional types of limitations are necessary.

an initiative measure that provided that the state could not abridge the right of any person to sell or decline to sell his property as he or she chooses. 387 U.S. at 370–71, 87 S.Ct. 1627. The Supreme Court held that "[t]he California Court could very reasonably conclude" that the result of Proposition 14 was that "[t]he right to discriminate, including the right to discriminate on racial grounds, was now embodied in the State's basic charter," *id.* at 376–77, 87 S.Ct. 1627, and that the initiative measure would "significantly encourage and involve the State in private discriminations." *Id.* at 381, 87 S.Ct. 1627.

Having studied *Reitman,* the Council Committee on Government Operations came to the view that for the Board to accept an initiative or referendum that would have the effect of discriminating, would involve the District government in condoning and assisting with discrimination.[43] The Council cited the language in *Reitman* that "the initiative process may not be used to place the Government in the posture of affirmatively condoning discrimination" and that "when the Government's official position of neutrality toward protected minority classifications (such as those identified in the Human Rights Act of 1977) is removed and a policy of discrimination is imposed, such measures will fail." IPA Report, at 9. Accordingly, the Committee recommended including in the IPA a mandate that the Board not accept any initiative or referendum that would authorize discrimination or have the effect of authorizing discrimination prohibited by the Human Rights Act.[44]

The Council's acceptance of the Committee's recommendation was consistent with the "highest priority" objective that the Council expressed during the same time period when it crafted the CAA. Because the Human Rights Act safeguard is consistent with that objective, we accept the Council's legislative interpretation, reflected in the IPA, that the safeguard im-

43. Such involvement and complicity, the Council doubtless realized, could not be avoided by a post-election repeal of a discriminatory measure; rather, the involvement of the Board and the expenditure of District funds to put such an initiative on the ballot would constitute the very involvement that the Council believed improper and would be contrary to the fundamental values expressed in the Human Rights Act.

44. As discussed earlier, the Human Rights Law originated as a police-power regulation, deemed "necessary for the protection of lives, limbs, health, comfort, and quiet of all persons and the protection of all property within the District of Columbia." D.C.Code § 1–303.03 (2006). When the Council included the Human Rights Act safeguard in the IPA, recent events would have afforded the Council good reason to anticipate that an initiative or referendum that would have the effect of authorizing discrimination could be a threat to the peace and to life and limb. It was widely reported in the press that, in 1977, Dade County, Florida had an ordinance that prohibited discrimination on the basis of sexual orientation. Activist Anita Bryant led a prominent campaign to repeal the ordinance, which was successful during the election held on June 7, 1977. The press reported that the campaign provoked violent clashes between proponents and opponents of repeal. *See, e.g.,* "Gay Rights Showdown in Miami," *TIME,* June 13, 1977, http://www.time.com/time/magazine/article/0,9171,918998–2,00. html (last visited July 13, 2010) (noting, *inter alia,* that a campaign worker was hospitalized after a beating). The *Washington Post* reported that the bitter five-month campaign leading up to the vote on the Dade County referendum was "one of the most emotionally charged ... in recent memory, with near hysteria on both sides of the issue." Mary Russell, "Gay Rights Loses 2–1 in Miami Law," *Washington Post,* June 8, 1977, section A 4, col. 1. An editorial cartoon in the paper captured the atmosphere of violence, depicting supporters of Bryant throwing rocks at supporters of the anti-discrimination ordinance. *Washington Post,* June 10, 1977, section A 26, col. 1.

plements the intent of the CAA.[45]

### B. Section 752 Gave the Council Authority to Direct the Board to Refuse to Accept Initiative and Referendum Measures That Would Authorize or Have the Effect of Authorizing Discrimination.

■ We further conclude that the Council was not obliged to allow initiatives that would have the effect of authorizing discrimination prohibited by the Human Rights Act to be put to voters, and then to repeal them, or to wait for them to be challenged as having been improper subjects of initiative, should they be approved by voters. Rather, the Council could legislate, as it did through the IPA, that the Board must refuse to accept initiatives and referenda that would authorize prohibited discrimination. We reach this conclusion because the CAA did not provide the Council its exclusive grant of authority to enact laws on matters relating to the ini-

tiative and referendum process. Rather, as already described, section 752 of the Home Rule Act conferred on the Council, "[n]otwithstanding any other provision of this [Act] or of any other law, ... authority to enact *any* act or resolution with respect to matters involving or relating to elections in the District." D.C.Code § 1–207.52 (emphasis added).[46]

As a provision of the Home Rule Act not subject to amendment by the Council or by the voters of the District, section 752 remains one of the provisions governing District affairs. *See* D.C.Code § 1–203.03(a) (providing that only the District Charter as set forth in Title IV of the Home Rule Act is subject to the Charter-amending procedure); D.C.Code § 1–206.02 (providing, per section 602 of the Home Rule Act, that the Council "shall have no authority to pass any act contrary" to the provisions of the Home Rule Act except as specifically provided in the Home Rule Act); and D.C.Code § 1–207.61(a) (2006) (providing

**45.** We note, as Chief Justice Roberts did when he declined to stay the effective date of the Marriage Equality Act, that when the IPA was passed (with the not-easily overlooked Human Rights Act safeguard), the legislation laid over before Congress for thirty legislative days without disapproval by either house. That "Congress ... chose[ ] not to act" is "of course not determinative of the legal issues," but does "weigh against appellants' position" that this obviously important and substantive provision of the IPA conflicted with the CAA. *Jackson,* 130 S.Ct. at 1280.

**46.** We are satisfied that initiatives and referenda are "matters involving or relating to elections" within the ordinary meaning of the word "election." Section 412(b) of the Home Rule Act authorized the Council to call "[a] special *election* ... by resolution of the Council to present for an advisory *referendum vote* of the people any proposition upon which the Council desires to take action." D.C.Code § 1–204.12(b) (italics added). The amended Charter specifically refers to a referendum as a "referendum election." D.C.Code § 1–

204.102(b)(1). The D.C.Code provisions relating to initiatives and referenda are set out in Title 1, Chapter 10, Subchapter I of the Code, entitled "Regulation of Elections." In light of these usages, we see no reason not to recognize that the initiative process, like the referendum process, entails an "election." Thus, we conclude that section 752 gave the Council authority to enact laws with respect to the initiative (and referendum) election process.

This does not mean that the Council could have conferred legislative authority on citizens of the District without using the Charter-amending procedure specified in the Home Rule Act (although the Council did consider establishing an initiative process as part of a set of initiatives concerning election law reform. *See* H.R.Rep. No. 95–890, at 9). Until the CAA was adopted, laws proposed by citizens were not "matters ... relating to elections." But once the rights to initiative and referendum had been created, the Council could rely on section 752 to legislate with respect to the conduct of initiative and referendum elections.

that the provisions of the Home Rule Act "shall prevail and be deemed to supersede" any other laws with which they are in conflict). Moreover, the "[n]otwithstanding any other provision of this Act or of any other law" language of section 752 is "strong stuff" that cannot be assumed to have been superseded by an after-enacted law. *Winters*, 596 A.2d at 573 (Schwelb, J., concurring) (reasoning that "[a] clearer statement [than "notwithstanding any other provision of law"] is difficult to imagine" and that this language "must be read to override any conflicting provision of law in existence at the time" and as "powerful evidence that Congress did not intend any other, more general, legislation, whenever enacted, to qualify the authority ... set out" in the Act that contains the "notwithstanding" clause) (italics omitted). And, the legislative history of the Home Rule Act suggests strongly that, through section 752, Congress intended to give the Council authority to legislate on substantive matters regarding elections (and not merely to establish procedures).[47]

▮▮ At the same time, "a statute generally should be read to give effect, if possible, to every clause," *Heckler v. Chaney*, 470 U.S. 821, 829, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (citation and internal quotation marks omitted), and it is a "basic axiom ... that courts should construe all legislative enactments to give them some meaning[.]" *Rosado v. Wyman*, 397 U.S. 397, 415, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). Adhering to these basic rules of construction, we decline to interpret the Council's authority under section 752 of the Home Rule Act in a way that effectively would mean that the initiative right, conferred through the Charter-amending procedures also set out in the Home Rule Act, could be rendered meaningless, or in a way that would so diminish the initiative right as virtually to nullify it. This "basic axiom" articulated in *Rosado* is especially applicable here since the right of initiative is "a right that Congress affirmatively approved." *See Stevenson*, 683 A.2d at 1375 ("[I]t is not without significance that Congress affirmatively approved the Charter Amendments Act after passage by the Council."). Accordingly, we must, if we can, harmonize section 752 and the CAA. We can do so, as follows.

At the time the Home Rule Act was passed, the Election Act mandated that the Board would be an independent agency. Specifically, the Election Act provided (and still provides, *see* D.C.Code § 1–1001.06(a) (2006)), that "[i]n the performance of its duties, the Board shall not be subject to the direction of any non-judicial officer of the District." D.C.Code § 1–

---

**47.** Section 752 appears to have originated as section 742 of a House bill, H.R. 9056, 93d Cong. 109110 (1973), and thereafter was included in a later bill, H.R. 9682, 93d Cong. 131 (1973), as section 752. The record of the Senate hearings shows that Congress was urged to leave to the Council "important nitty-gritty questions" such as whether ex-felons would be permitted to vote and whether there could be a durational residency requirement for voting (the constitutionality of which was in question). *See* Hearing on S. 1603 and S. 1626, 92d Cong. 222, 228. Congress was urged to "make only those changes" to the Election Act that were "absolutely necessary to enable the first election to be held," leaving it to the Council or Congress later to make "a thorough revision." *Id.* at 231. The Report of the Committee on the District of Columbia on H.R. 9682 together with Dissenting Views, 93d Cong., 1st Sess. (Sept. 11, 1973) includes a "Dissenting Commentary on Significant Provisions of H.R. 9682." H.R. Rep. 93–482, at 141 (1973). That commentary asserts that section 752 "would permit the local government to exempt all District employees from the Hatch Act, which currently prohibits employees of the Federal and District Governments from taking an active part in political management or in political campaigns." *Id.* at 165 (internal quotation marks omitted).

1106(a) (1973). We interpret section 752 to confer upon the Council the authority to enact laws giving direction to the Board in the handling of election matters, notwithstanding the Board's status as an independent agency.[48] This is what the Council did in imposing the Human Rights Act safeguard of the IPA, by declaring that, consistent with the Council's interpretation of the scope of the right of initiative in the CAA, the Board must refuse to accept initiative measures that it determined would authorize prohibited discrimination. In doing so, the Council explicitly relied on its authority under section 752. *See* IPA Report, at 11 ("Further legal support for the provisions of the enabling legislation here presented are found in [section 752], which grant[s] the Council plenary authority over all election matters."). Under section 752—and despite what one court has called the "general rule favoring postelection review" of the validity of a proposed initiative measure[49]—the Council had authority to require the Board to conduct pre-election review of whether the subject matter of a proposed initiative is a proper subject matter. *See Convention Ctr. III,* 441 A.2d at 914 (concluding that the IPA mandate that the Board exclude from the ballot a referendum measure that would negate a budget-request act "comports with the Charter Amendment limitations on the initiative right [and that] the reliance of the Board ... on that provision was entirely proper").[50] The Board's decision, as has been made evident by this and many other cases, is subject to prompt judicial review.

For all the foregoing reasons, we are unpersuaded by appellants' contention that the Council either overstepped its authority or acted in contravention of the CAA when it imposed the Human Rights Act safeguard of the IPA.[51]

48. As originally proposed in the House Bill (H.R.9056), section 752 (then numbered as section 742) read "[n]otwithstanding any other provision of this Act or of any other law, the Council shall have *jurisdiction* to legislate with respect to matters involving or relating to elections in the District" (italics added). H.R. 9056, 93d Cong. 109110. This language supports a reading that a focus of section 752 was the Council's authority vis-a-vis the independent Board.

49. *Legislature v. Deukmejian,* 34 Cal.3d 658, 194 Cal.Rptr. 781, 669 P.2d 17, 20 (1983) (per curiam).

50. Appellants have not contended that the resultant prior subject-matter restraint on initiative measures implicates the First Amendment right to free speech, and relevant persuasive authority is to the contrary. "The First Amendment imposes no restriction on the withdrawal of subject matters from the initiative process." *Marijuana Policy Project,* 304 F.3d at 84–85 (holding that, by complying with the so-called Barr Amendment (through which Congress banned the District from making any expenditures to reduce penalties associated with marijuana) in rejecting a proposed initiative that would reduce marijuana penalties, the Board did not violate the First Amendment, because "although the First Amendment protects public debate about legislation, it confers no right to legislate on a particular subject.") (citing *Skrzypczak v. Kauger,* 92 F.3d 1050 (10th Cir.1996)) (holding that state supreme court decision removing an abortion initiative from the ballot did not violate a voter's First Amendment rights because the voter remained free "to argue against legalized abortion, to contend that pre-submission content review of initiative petitions is unconstitutional, or to speak publicly on any other issue"), *overruled on other grounds by Initiative & Referendum Inst. v. Walker,* 450 F.3d 1082, 1099 (10th Cir.2006) (en banc) ("Although the First Amendment protects political speech incident to an initiative campaign, it does not protect the right to make law, by initiative or otherwise."). There is "no law ... establishing a right to have a particular proposition on the ballot." *Skrzypczak,* 92 F.3d at 1053.

51. One final point: There is no doubt that, through the Human Rights Act and the Human Rights Act safeguard, the Council has sought to promote a broad policy of non-discrimination that will preclude voters from

### C. The Proposed Initiative Would Authorize or Have the Effect of Authorizing Discrimination Prohibited by the Human Rights Act.

Appellants further contend that even if the Human Rights Act safeguard is valid, their proposed "Marriage Initiative of 2009" does not run afoul of the restriction. They assert that this court's decision in *Dean v. District of Columbia*, 653 A.2d 307 (D.C.1995), establishes "conclusively" that the Human Rights Act "does *not* reach the marital relationship."

The Board urges us to uphold its determination, arguing in its brief that the proposed initiative (providing that "[o]nly marriage between a man and a woman is valid or recognized in the District of Columbia") would render not only JAMA but also the Marriage Equality Act "null and void and would consequently strip all same sex married couples of their attendant rights and responsibilities of marriage in the District of Columbia" based solely on the "gender and/or sexual orientation of the spouses." In its November 17, 2009 Memorandum Opinion and Order, the Board distinguished *Dean* and reasoned as follows:

> While neither the HRA [i.e., the Human Rights Act] nor its legislative history explicitly mentions same-sex marriage, it is without question that the HRA must "be read broadly to eliminate the many proscribed forms of discrimination in the

District." Since JAMA's enactment, the District recognizes same-sex marriages that have been properly entered into, performed, and recognized by other jurisdictions. This did not exist when *Dean* was decided. Consequently, couples who fall within JAMA's purview are entitled to the same benefits of marriage that are afforded heterosexual married couples, and the denial of these benefits to married couples on the basis of the sexual orientation of the individuals who comprise the couples now constitutes a "proscribed form of discrimination." It is clear that this result is the intent of the Council, which voted 12–1 to pass JAMA. The Initiative seeks to deny recognition to JAMA marriages on the basis of the sexual orientation of the individuals who comprise the couples. As a result, the Board finds, and both the District's Attorney General and General Counsel for the Council agree, that the Initiative authorizes or would authorize discrimination proscribed by the HRA and is therefore not a proper subject for initiative.

*Id.* at 11.

We agree with the Board's interpretation of *Dean*, its view that the Human Rights Act analysis in *Dean* has limited continuing significance, and its conclusion that the proposed initiative would have the effect of authorizing discrimination on the basis of sexual orientation.[52] In *Dean*, a

---

putting some measures on the ballot. To the extent that citizens disagree with this fundamental policy, they are not without a remedy. The Council "is, in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541–42, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001) (citation and internal quotation marks omitted).

**52.** Although the Board's brief argues that the proposed initiative would authorize or have the effect of authorizing discrimination on the basis of "gender and/or sexual orientation," the Board's decision was that the initiative would authorize discrimination prohibited by the Human Rights Act in that it would "deny recognition to ... marriages on the basis of the sexual orientation of the individuals who comprise the couples." Accordingly, our analysis focuses only on the correctness of that ruling.

panel of this court considered a claim by a same-sex couple that, "by refusing to issue them a marriage license, the Clerk [of the Superior Court acting through the Marriage License Bureau] discriminated against them because of their sex or sexual orientation, in violation of the Human Rights Act, D.C.Code §§ 1–2501 to –2557 (1992)." 653 A.2d at 318. Before reaching this issue, the court set out a lengthy discussion of the language and legislative history of the District's marriage statute, which, the *Dean* court concluded, "demonstrate that neither Congress nor the Council of the District of Columbia has ever intended to define 'marriage' to include same-sex unions." *Id.* at 310. The *Dean* opinion noted that the only significant changes in the District's marriage and divorce provisions since 1901 had occurred in the Marriage and Divorce Act of 1977, D.C. Law 1–107, 1977 D.C. Stat. 114. *Id.* at 311. On the path to enacting that legislation, which "merely amended existing code provisions," *Id.* at 312, the Council had declined to act favorably on a bill introduced by Councilmember Dixon that would have permitted marriages between persons of the same sex. *Id.* at 311. The court saw no "indication that more recent Congresses, or the Council in amending the marriage statute, ever modified the fundamental legislative understanding that 'marriage' is limited to opposite-sex couples." *Id.* at 314. Rather, the court concluded, there was a "consistent legislative understanding and intent that 'marriage' means—and thus is limited to—unions between persons of opposite sexes." *Id.* at 315. This "statutory understanding [was]

further confirmed by the ordinary sense and meaning traditionally attributed to the word 'marriage' " in dictionary definitions. *Id.* The court could not "conclude that any legislature for the District of Columbia that has addressed the marriage statute has ever intended to authorize same-sex unions." *Id.* ("[C]ases from other jurisdictions with marriage statutes similar to the District's ... have uniformly interpreted [']marriage,' by definition, as requiring two members of opposite sexes").

Turning to the Human Rights Act claim, the *Dean* court noted that the version of the Human Rights Act in effect at the time made it "an unlawful discriminatory practice" for one to "deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations," if the denial is "wholly or partially for a discriminatory reason based on the ... sex ... [or] sexual orientation ... of any individual." *Id.* at 318–19. The court acknowledged the appellants' argument that "when the Marriage License Bureau, a place of public accommodation under the Clerk of the Superior Court, refuses to issue marriage licenses to same-sex couples, gays and lesbians are unlawfully denied an 'equal opportunity' to participate in marriage, an important 'aspect of life.' " *Id.* at 318. The court assumed, "without formally deciding," that the Marriage License Bureau is a "place of public accommodation" (in which discrimination was specifically prohibited under the Human Rights Act). *Id.* at 319.[53] The court further acknowledged that "[t]he Council un-

---

53. The court noted that the Human Rights Act defined a "place of public accommodation" to include "establishments dealing with goods or services of any kind," as well as "public halls." It noted the position of *amicus* Human Rights Commissioners that "all District of Columbia agencies are places of public

accommodation, within the meaning of the Human Rights Act, because they provide goods and services to District residents." *Id.*; *cf. Ptaszynski v. Uwaneme,* 371 N.J.Super. 333, 853 A.2d 288, 297 (N.J.App.Div.2004) (holding that "any State governmental agency is a place of public accommodation" for pur-

doubtedly intended the Human Rights Act to be a powerful, flexible, and far-reaching prohibition against discrimination of many kinds, including sex and sexual orientation." *Id.* The court reasoned, however, that the Council "did not intend the Act to prohibit every discriminatory practice," *id.*, and went on to hold:

> [W]e cannot conclude that the Council ever intended to change the ordinary meaning of the word "marriage" simply by enacting the Human Rights Act. Had the Council intended to effect such a major definitional change, counter to common understanding, we would expect some mention of it in the Human Rights Act or at least in its legislative history.... There is none.... [A]s we have seen—"marriage" requires persons of opposite sexes; there cannot be discrimination against a same-sex marriage if, by independent statutory definition extended to the Human Rights Act, there can be no such thing.

*Id.* at 320.

■ While the *Dean* court unambiguously concluded that the Marriage Bureau's implementation of the District's longstanding marriage statutes, and the definition of marriage reflected therein, did not amount to discrimination prohibited by the Human Rights Act, there is no dispute that the landscape has changed dramatically. Through JAMA and the Marriage Equality Act, the Council has both acknowledged and endorsed an expanded definition of marriage to include same-sex unions. As the briefs inform us, several other jurisdictions, too, currently authorize same-sex marriage. The question now is whether an initiative measure that would deny recognition to individuals who have entered or wish to enter into same-sex marriages in the District or elsewhere, and would deprive them of the benefits and obligations that come along with such recognition, would authorize or have the effect of authorizing discrimination on a basis prohibited by the Human Rights Act. We have no difficulty concluding that the proposed initiative would do so.[54] The proposed initiative would require District government agencies and of-

---

poses of the definition of "place of public accommodation" in the New Jersey Law Against Discrimination, N.J. Stat. § 10:5–5(*l*)); *see also Thomas v. Cnty. of Camden,* 386 N.J.Super. 582, 902 A.2d 327, 332 (N.J.App.Div.2006) ("[P]ublic entities ..., by their very nature, constitute a place of public accommodation").

**54.** In 2002, the pertinent provision of the Human Rights Act was amended to read as follows:

> Except as otherwise provided for by District law or when otherwise lawfully and reasonably permitted, *it shall be an unlawful discriminatory practice for a District government agency or office to limit or refuse to provide any facility, service, program, or benefit to any individual on the basis of an individual's actual or perceived:* race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, disability,

matriculation, political affiliation, source of income, or place of residence or business. D.C.Code § 2–1402.73 (2006) (italics added). This amendment is fairly regarded as a clarification. As discussed, in 1977 the Home Rule Council re-enacted without substantive change the Human Rights Law, regarding which the pre-Home Rule Council said that it was "a priority ... that District government will be the first to comply" with the "spirit" of the law, such as by addressing complaints of discrimination against police officers. Human Rights Law Report, at 2. In Executive Order 94–132 (May 19, 1994), then-Mayor Sharon Pratt Kelly summarized the interpretation that enjoyed acquiescence: that "Offices and agencies of the District government are covered by the prohibitions of the Human Rights Act.... No ... agency of the District government may engage in any prohibited activity, including denial of full and equal enjoyment of its services, facilities, privileges or advantages to any person in violation of

fices that provide or administer an array of services, programs, and benefits otherwise available to married persons, to deny certain of those services, programs, or benefits to individuals who are partners to a same-sex rather than opposite-sex union.[55] The initiative thus would take away from those individuals a civil right that the Council has seen fit to recognize and expressly allow, and its effect would be to authorize discrimination on the basis of sexual orientation. Although, theoretically, it is possible that heterosexuals of the same gender would enter into a same-sex marriage, there can be no dispute that the impact of District agencies' refusal to recognize same sex-marriage would fall most heavily on gay and lesbian residents,[56] denying them the ability to participate fully in an important aspect of life in the District.

■ We must address, however, the question of whether the Human Rights Act safeguard of the IPA required the Board to evaluate a proposed initiative under the Human Rights Act of 1977—the legislation specified in the IPA—rather than under the version of the Human Rights Act at the time of the Board's determination. As the District's brief acknowledges, under general rules of statutory construction, a statute that specifically refers to another statute "incorporates the provisions referred to . . . as of the time of adoption

without subsequent amendments, *unless the legislature has expressly or by strong implication shown its intention to incorporate subsequent amendments.*" 2B Norman J. Singer, *Sutherland Statutes and Statutory Construction* § 51.08 (7th ed. 2008) (italics added). We are satisfied that the italicized exception rather than that general rule, is applicable here. The legislative history of the IPA guides our interpretation. As reported by the Committee on Government Operations, Bill 2–317 prohibited initiatives that discriminated "by reason of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, matriculation, political affiliation, physical handicap, source of income, and place of residence or business." Memorandum from Louis P. Robbins, Principal Deputy Corporation Counsel, to Judith W. Rogers, Special Assistant for Legislation, regarding Supplemental comments on Bill 2–317, the "Initiative, Referendum, and Recall Procedures Act of 1978," at 1 (June 2, 1978) (quoting Amendment to § 212 of Bill No. 2–317). As explained to members of the Committee in a memorandum from the Legislative Assistant to the Chairman, the amendment to the bill when it was re-introduced as Bill 3–2, stating that "the Board of Elections [and] Ethics cannot accept any petitions which authorize discrimination prohibited under the Human Rights Act of 1977," was

the Human Rights Act." *See also* note 53 *supra.*

**55.** The Board's brief refers to the "more than 200 District rights and responsibilities of civil marriage."

**56.** *See Estenos v. PAHO/WHO–Fed. Credit Union,* 952 A.2d 878, 887 (D.C.2008) (explaining that under the Human Rights Act, " 'despite the absence of any intention to discriminate, practices are unlawful if they bear disproportionately on a protected class and are not independently justified for some nondiscriminatory reason' ") (quoting *Gay Rights Coal. of*

*Georgetown Univ. Law Ctr. v. Georgetown Univ.,* 536 A.2d 1, 29 (D.C.1987)) (en banc) ("[T]he Council imported into the Human Rights Act, by way of the effects clause, the concept of disparate impact discrimination[.]" (further citation omitted)); *cf. Loving v. Virginia,* 388 U.S. 1, 2, 8, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (rejecting the argument that because a statute prohibiting interracial marriage applied equally to black and white citizens, it did not discriminate on the basis of race).

"merely a technical change, whereby the language [that] prohibits specific discriminatory types of petitions has been deleted.... The effect is synonymous with that of Bill 2–317 [which contained the list of proscribed categories of discrimination, including sexual orientation]." Memorandum from Deborah K. Green, Legislative Assistant to the Chairman, to the Committee on Government Operations, on Bill 3–2, the "Initiative Referendum and Recall Procedures Act of 1979," February 6, 1979, at 2.

In light of that documentation, we regard the IPA's reference to the Human Rights Act of 1977 as a shorthand indication that the Council meant to require the Board to perform its gatekeeper function by determining whether a proposed initiative would authorize discrimination of the type currently prohibited by the District's human rights law, not by looking only to that law as it existed in 1977. We see no evidence that the Council "intended by such specific reference[ ] [to the Human Rights Act of 1977 and to its D.C.Code citation] any limitation on subsequent amendments which ameliorated the remedial scheme." *EEOC v. Chrysler Corp.*, 546 F.Supp. 54, 74 (E.D.Mich.1982). Moreover, in enacting the Human Rights Act, the Council re-enacted prior law (the Human Rights Law) that explicitly was intended to "provide a regulation of sufficient scope and flexibility to be responsive to future needs for the protection of civil and human rights," since "there may be contexts and reasons for discrimination tomorrow that we do not anticipate today." Human Rights Law Report, at 2. We believe it would contravene the legislative intent to require the Board to apply a dated version of the Human Rights Act

that may not be, as the pre-Home Rule Council described and as the Home Rule Council implicitly echoed, adequate to answer the "future needs and circumstances of modern life." *Id.*

## V. Conclusion

The Council acted within its authority under the CAA and the Home Rule Act in enacting the Human Rights safeguard of the IPA and in directing the Board not to accept initiatives that contravene that safeguard. Because appellants' proposed initiative would authorize, or have the effect of authorizing, discrimination on a basis prohibited by the Human Rights Act, it was not a proper subject of initiative. Therefore, the Board acted lawfully in refusing to accept the initiative on that basis. Accordingly, the judgment of the Superior Court upholding the Board's determination is

*Affirmed.*

FISHER, Associate Judge, with whom WASHINGTON, Chief Judge, and GLICKMAN and OBERLY, Associate Judges, join, dissenting:

This appeal is about legislative authority—that vested in the Council of the District of Columbia and that granted to the voters at large. In 1978, five years after the Home Rule Act transformed governance in the District of Columbia, the Council, the voters, and the Congress of the United States, acting in collaboration, amended the District Charter (Title IV of the Home Rule Act) for the first time, creating the right of initiative so that the voters themselves could propose and approve legislation.[1]

---

**1.** An initiative is "the process by which the electors of the District of Columbia may propose laws (except laws appropriating funds) and present such proposed laws directly to

the registered qualified electors of the District of Columbia for their approval or disapproval." D.C.Code § 1–204.101(a) (2006). If a majority of those voting approves an initia-

The following year, the Council enacted implementing legislation known as the Initiative, Referendum and Recall Procedures Act of 1979 (the "IPA"). In addition to establishing procedures for submitting, processing, and voting on an initiative petition, the IPA placed a limit on the subject matter that could be addressed by an initiative. The Council instructed the Board of Elections and Ethics not to accept a measure if it "authorizes, or would have the effect of authorizing, discrimination prohibited under" the District of Columbia Human Rights Act. This subject matter limitation on the right of initiative is not found in the Charter, which created that right, or in the more comprehensive Home Rule Act, which places certain limits on the legislative power of the District.

In 2009, appellants[2] proposed that the voters exercise their right of initiative and declare that "[o]nly marriage between a man and a woman is valid or recognized in the District of Columbia." The Board refused to accept the measure, holding that the proposal was not a "proper subject of initiative" because it would authorize, or have the effect of authorizing, discrimination prohibited by the Human Rights Act. This court must decide, as a matter of first impression, whether the IPA's "Human Rights Act limitation" is a valid restriction on the right of initiative. For the reasons which follow, we would hold that it is not.

Had our view prevailed, we would not have reached the question whether the Board properly refused to accept the proposed initiative. In light of the majority's holding, however, and in light of recent legislation recognizing and authorizing same-sex marriages in the District of Columbia, we agree with the majority's conclusion that the proposed initiative would authorize, or have the effect of authorizing, discrimination prohibited by the Human Rights Act, as amended in 2002.

## I. The Factual and Procedural Background

On two occasions (in 2009 and 2010), appellant Jackson and others presented referendum[3] petitions to the Board, seeking to suspend two acts of the Council relating to same-sex marriage, but their efforts were unsuccessful. The Board rejected the proposed referenda, citing the Human Rights Act ("HRA"), litigation ensued, and the acts became law.[4] "No act is subject to referendum if it has become law according to the provisions of § 1–204.04 [after a period of congressional review]." D.C.Code § 1–204.102(b)(2) (2006).

The Jury and Marriage Amendment Act of 2009, which became law on July 7, 2009,

tive, it becomes law, assuming (as is also true for an act of the Council) that it is not disapproved during a mandatory period of Congressional review. D.C.Code § 1–204.105 (2006).

**2.** Appellants, the proponents of the Marriage Initiative of 2009, are Bishop Harry Jackson, Jr., Reverend Walter Fauntroy, Reverend Dale Wafer, Melvin Dupree, Apostle James Silver, Reverend Anthony Evans, Robert King, and Elder Howard Butler.

**3.** "The term 'referendum' means the process by which the registered qualified electors of the District of Columbia may suspend acts of

the Council of the District of Columbia (except emergency acts, acts levying taxes, or acts appropriating funds for the general operation budget) until such acts have been presented to the registered qualified electors of the District of Columbia for their approval or rejection." D.C.Code § 1–204.101(b) (2006).

**4.** The Superior Court, this court, and Chief Justice Roberts, sitting as Circuit Justice, declined to stay the effective date of the Religious Freedom and Civil Marriage Equality Amendment Act of 2009. *See Jackson v. District of Columbia Board of Elections and Ethics,* —— U.S. ——, 130 S.Ct. 1279, 176 L.Ed.2d 102 (2010).

provides that the District of Columbia will recognize "[a] marriage legally entered into in another jurisdiction between 2 persons of the same sex...." D.C.Code § 46–405.01 (2010 Supp.). On March 3, 2010, the Religious Freedom and Civil Marriage Equality Amendment Act of 2009 became law. It allows couples of the same sex to marry in the District of Columbia. D.C.Code § 46–401 (2010 Supp.).

Meanwhile, on September 1, 2009, appellants submitted the Marriage Initiative of 2009. The Board refused to accept the initiative, reasoning that, "[i]f passed, [it] would, in contravention of the HRA, strip same-sex couples of the rights and responsibilities of marriages currently recognized in the District.... Because the Initiative would authorize discrimination prohibited by the HRA, it is not a proper subject for initiative, and may not be accepted by the Board." Appellants petitioned for review by the Superior Court, and for a writ of mandamus. The trial court allowed the District of Columbia to intervene and later granted summary judgment to the Board and the District. This appeal followed.[5]

## II. The "Constitutional" Framework

The Constitution of the United States of America vests in Congress the power to legislate for the District of Columbia "in all Cases whatsoever." U.S. Const. art. I, § 8, cl. 17. However, in 1973 Congress enacted the District of Columbia Self Government and Governmental Reorganization Act, Pub.L. 93–198, 87 Stat. 777 (1973) (codified at D.C.Code §§ 1–201.01—1–207.71), popularly known as the Home Rule Act. Through this transforming legislation, Congress delegated some, but not all, of its legislative power over this jurisdiction to the Council of the District of Columbia while retaining ultimate legislative authority over the District. See D.C.Code §§ 1–204.04, 1–206.01; see also District of Columbia v. Greater Washington Central Labor Council, AFL–CIO, 442 A.2d 110, 113–14 (D.C.1982) (discussing Congress's delegation of legislative power). Congress intended, among other things, to "grant to the inhabitants of the District of Columbia powers of local self-government ... and, to the greatest extent possible, consistent with the constitutional mandate, relieve Congress of the burden of legislating upon essentially local District matters." D.C.Code § 1–201.02 (2006).

Nevertheless, the Home Rule Act contains several limitations on the legislative power of the District.[6] For example, the Council has no authority to "[i]mpose any tax on property of the United States," to enact a "commuter tax" on the income of persons who do not reside in the District, to alter the organization and jurisdiction of the District of Columbia courts, or to "amend or repeal any Act of Congress ...

---

**5.** Although the acts of the Council related to same-sex marriage have become law, this appeal is not moot. We have held that the right of initiative may be used to repeal or amend existing legislation. Convention Center Referendum Committee v. District of Columbia Board of Elections and Ethics, 441 A.2d 889, 909 & n. 38 (D.C.1981) (en banc) (Convention Center III ).

**6.** See D.C.Code § 1–203.02 (entitled "Legislative power"), which states:

> Except as provided in §§ 1–206.01 to 1–206.03, the legislative power of the District shall extend to all rightful subjects of legis-

lation within the District consistent with the Constitution of the United States and the provisions of this chapter subject to all the restrictions and limitations imposed upon the states by the 10th section of the 1st article of the Constitution of the United States.

Article I, Section 10, of the Constitution forbids the states to do a variety of things, including entering into treaties, coining money, granting a title of nobility, or, without the consent of Congress, laying any duty of tonnage.

which is not restricted in its application exclusively in or to the District[.]" D.C.Code § 1–206.02(a)(1), (3), (5), (8) (2006); *see also* D.C.Code § 1–206.03 (restrictions related to the budget process).

The Home Rule Act is now found in Chapter 2 of Title 1 of the D.C.Code, and Subchapter IV of Chapter 2, the District Charter, "establish[es] the means of governance of the District...." D.C.Code § 1–203.01. As we have noted, see *supra* note 6, legislation passed by the Council (or by initiative) must be "consistent with the Constitution of the United States and the provisions of this chapter [the Home Rule Act]...." D.C.Code § 1–203.02. The Home Rule Act and the District Charter thus serve as a constitution for the District. *See Convention Center III*, 441 A.2d at 903 (plurality opinion) (legislation enacted by the Council must "be consistent with the U.S. Constitution and the Home Rule Act"); *id.* at 930 (dissenting opinion) ("it is beyond serious dispute that legislation may not amend a constitution (the Charter)"); *District of Columbia v. Washington Home Ownership Council, Inc.*, 415 A.2d 1349, 1367 (D.C.1980) (en banc) (concurring opinion) (referring to the Home Rule Act as "the 'constitutional' analog").

The Home Rule Act includes a process for amending the Charter which requires collaboration among the Council, the voters of the District of Columbia, and Congress. With certain exceptions not relevant here, the Charter "may be amended by an act passed by the Council and ratified by a majority of the registered qualified electors of the District voting in the referendum held for such ratification." D.C.Code § 1–203.03(a). At the time of

the Charter Amendments Act, on which we will focus here, the Home Rule Act required that Congress "adopt a concurrent resolution ... approving such amendment" before it would become effective. D.C.Code § 1–125(b) (1977 Supp.). Now, an amendment to the Charter takes effect unless Congress, during a period of congressional review, enacts a joint resolution disapproving the amendment. D.C.Code § 1–203.03(b).

### III. The Right of Initiative and Its Limits

The rights of initiative, referendum, and recall were added to our form of government in 1978 by the Charter Amendments Act ("CAA") and thereby became part of the District's Charter. D.C. Law 2–46, 24 D.C.Reg. 199 (1977) (as approved by H.R. Con. Res. 464 & 471, 95th Cong. (1978)) (codified at D.C.Code § 1–204.101–107 (initiative and referendum) and D.C.Code § 1–204.111–115 (recall)). These Charter Amendments are "functionally equivalent" to constitutional amendments, *Convention Center Referendum Committee v. Board of Elections and Ethics*, 399 A.2d 550, 551 (D.C.1979) (*Convention Center I* ), and they may not be changed by ordinary legislation. "We are required to construe the right of initiative liberally ... and may impose on the right 'only those limitations expressed in the law or "clear[ly] and compelling[ly]" implied.' " *Hessey v. Burden*, 584 A.2d 1, 3 (D.C.1990) (*Hessey I* ) (quoting *Convention Center III*, 441 A.2d at 913).

As amended, the Charter includes one express limitation on the subject matter of an initiative[7]—the voters may not propose "laws appropriating funds."[8] Other ex-

---

7. Demonstrating that it thought carefully about the need for express limitations when drafting the Charter Amendments Act, the Council placed three express limitations on the right of referendum. See *supra* note 3.

8. The parties agree that this case does not implicate this express limitation on the right of initiative.

press limitations are found elsewhere in the Home Rule Act; as we have already mentioned, the legislative power of the District (whether exercised by the electors directly or by the Council) does not extend to certain enumerated subjects. Some limitations are implicit—"[t]he initiative right must conform to the structure of government established by Congress in the Charter." *Hessey v. District of Columbia Board of Elections and Ethics*, 601 A.2d 3, 19 (D.C.1991) (*Hessey II* ). Importantly, all of these limitations, whether express or implied, are found in the Charter or the Home Rule Act.

## IV. The Human Rights Act

In 1973, the District of Columbia Council (the predecessor of the current Council of the District of Columbia) adopted Title 34 of the District of Columbia Rules and Regulations, known as the "Human Rights Law" (34 DCRR § 3.1). "In enacting Title 34, the City Council looked beyond the Civil Rights Act of 1964, including Title VII, to other civil rights legislation enacted by Congress more than 100 years ago [referring to an 1866 law now codified, as amended, at 42 U.S.C. §§ 1981 and 1982.]" *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 371 (D.C.1993). Title 34 also drew upon a rich history of local legisla-

tion, police regulations, and Commissioners' Orders dating back to 1869 that prohibited various types of discrimination in the District of Columbia.[9]

Concerned that the police power regulations in Title 34 might not have the same force and effect as a statute, the (post Home Rule) Council of the District of Columbia re-enacted the regulations as The Human Rights Act of 1977. *Blodgett v. University Club*, 930 A.2d 210, 217 (D.C. 2007). The first section of the Human Rights Act explains that the legislature intended "to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit. . . ." The substantive provisions which existed in 1977 prohibited discrimination in public accommodations, employment, educational institutions, and housing and commercial space based upon many characteristics, including sex and sexual orientation.

"In amending the [Human Rights Act] in 1997, the legislature emphasized its 'broad scope' and the fact that its coverage is wider than Title VII:

The District's human rights law has long been praised for its broad scope. The law bans discrimination in employment, housing, public accommodations, and education. It protects people from

**9.** *See, e.g., District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953) (involving 1872 and 1873 acts of the Legislative Assembly of the District of Columbia which, among other things, prohibited racial discrimination by restaurant keepers and hotel proprietors); *Newsweek Magazine v. District of Columbia Commission on Human Rights*, 376 A.2d 777, 783 (D.C.1977) (noting that Title 34 repealed and replaced Article 40 (Concerning Admission to, and Accommodation in, Licensed Places of Public Amusement in the District of Columbia), Article 45 (Prohibiting Discrimination by Reason of Race, Color, Religion or National Origin Against Persons Seeking or Utilizing Housing Units), and Article 47 (Pro-

hibiting Discrimination by Reason of Race, Color, Religion, National Origin or Sex Against Persons Seeking or Engaged in Employment in the District of Columbia) of the Police Regulations of the District of Columbia); *Filippo v. Real Estate Commission of the District of Columbia*, 223 A.2d 268 (D.C.1966) (affirming order which suspended license of real estate broker who violated fair housing regulations found in Article 45 of the Police Regulations); *Central Amusement Co. v. District of Columbia*, 121 A.2d 865 (D.C.1956) (prosecution for violating 1869 police regulation, then still in effect, which prohibited racial discrimination in places of public amusement).

discrimination based on characteristics covered in federal civil rights law—race, color, sex, religion, age, national origin, and disability—as well as other characteristics not covered under federal law, such as sexual orientation, marital status, and family responsibilities."

*Lively v. Flexible Packaging Ass'n,* 830 A.2d 874, 887 (D.C.2003) (en banc) (quoting D.C. Council, Committee on Government Operations, Report on Bill 12–34, "The Human Rights Amendment Act of 1997," at 2 (May 29, 1997)).

We have described the Human Rights Act as "a powerful, flexible, and far-reaching prohibition against discrimination of many kinds," *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.,* 749 A.2d 724, 732 (D.C.2000) (citation and internal quotation marks omitted), and its reach has expanded significantly since 1977.[10] "Among the statute's basic purposes is reinforcement of the Council's view that the Human Rights Act is among our most important laws and is to be vigorously enforced by all agencies and officials of the District Government. . . ." *Gay Rights Coalition of Georgetown University Law Center v. Georgetown University,* 536 A.2d 1, 33 (D.C.1987) (en banc) (internal quotation marks and citation omitted). Nevertheless, by contrast to the Charter, the Human Rights Act is not part of our local "constitution." The Council may amend the Human Rights Act by ordinary legislation, and frequently has done so. See *supra* note 10.

In light of this community's longstanding commitment to securing an end to discrimination, it is entirely understandable that citizen groups and the Council would recognize the possibility that "a proposed initiative measure [might seek to] authorize discrimination as a policy for this community." D.C. Council, Report on Bill 2–317 at 11 (May 3, 1978). These concerns emerged when the Council turned to the task of implementing the newly created rights of initiative, referendum, and recall.

## V. The Initiative, Referendum and Recall Procedures Act of 1979

The Charter Amendments Act did not prescribe how the newly-created rights of initiative, referendum, and recall were to be implemented. Instead, Section 8 of Amendment No. 1 (which established the rights of initiative and referendum) instructed:

> The Council of the District of Columbia shall adopt such acts as are necessary to carry out the purpose of this Amendment within one hundred and eighty (180) days of the effective date of this Amendment. Neither a petition initiating an initiative nor a referendum may be presented to the District of Columbia Board of Elections and Ethics prior to October 1, 1978.

D.C. Law 2–46, Amendment No. 1 § 8, 1978 D.C. Statutes-at-Large 33, 34–35 (1978 Comp.) (the codified statute, D.C.Code § 1–204.107, uses the term "subpart" in place of "Amendment"). The outcome of this appeal depends mainly on how

---

10. The Human Rights Act was extended to cover government services in 2002. Human Rights Amendment Act of 2002, D.C. Law 14–189 § 2(g) (Act 14–399), 49 D.C.Reg. 6523 (2002) (codified at D.C.Code § 2–1402.73 (2007)). Since 1977, several protected categories, including "gender identity or expression" and "familial status," have been added. *Compare* D.C.Code § 2–1401.01 (2007) *with* D.C.Code § 6–2201 (1978 Supp.). Councilmember Alexander has recently introduced a bill to amend the Human Rights Act "to protect victims and family members of victims of domestic violence, sexual abuse, and stalking against discrimination by employers." Bill 18–0796, proposing the "Protecting Victims of Crime Amendment Act of 2010."

we construe this portion of Amendment No. 1.

## A. Creating Time to Implement the CAA

The District of Columbia asserts that "[d]eciding what acts are 'necessary to carry out' the undefined 'purpose' of the CAA requires policy decisions that are properly left to the Council and that this Court cannot make without expressing lack of the respect due coordinate branches of government." We disagree.

We focused on these same provisions in *Convention Center I*, where this court held that the Charter Amendments were not self-executing. After quoting or describing various excerpts from the legislative history, we characterized Section 8 as a "legislative mandate," 399 A.2d at 553, for the Council to pass "enabling legislation," *id.* at 551, 552, "implementing legislation," *id.* at 553, or "implementing acts." *Id.* "[T]he drafters chose the October 1 date on the assumption that the necessary preparations for administering an initiative election—the passage of implementing legislation and the allocation of monies to the Board—would be completed." 399 A.2d at 553. If the Council acted, as directed, within 180 days, the implementing steps would be completed before the Amendment took effect on October 1.[11] Notably, Section 8 of Amendment No. 1 does not purport to enlarge the Council's authority;

it does not contain any additional delegation of Congressional power.

The majority points to models of other language that might have been used if the Council were expected "to enact merely procedural rules governing the initiative and referendum process." (Judge Thompson's opinion at 24) A similar point should be made about the majority's comparison of Section 8's language to the "necessary and proper" clause of Article I, Section 8, Clause 18 of the Constitution.[12] That model might have been used *if* the Council, the voters, *and the Congress* intended that Section 8 enhance the power of the Council. The fact that the word "necessary" appears in both places does not make this an apt comparison.

Moreover, any mystery about the purpose of the CAA evaporates when Section 8 of Amendment No. 1 is considered in context, as it should be. *See District of Columbia v. Beretta, U.S.A., Corp.,* 872 A.2d 633, 652 (D.C.2005) (en banc) ("[W]e do not read statutory words in isolation; the language of surrounding and related paragraphs may be instrumental to understanding them."). Rather than being "undefined," and perhaps indiscernible, as the District suggests, the "purpose" of the CAA was "[t]o amend the Charter of the District of Columbia to provide for the power of initiative, referendum, and recall." D.C. Law 2–46, Preamble, 1978 D.C. Statutes–at–Large 33 (1978 Comp.). The CAA contained two amendments to

---

11. The House Report accompanying the concurrent resolution which approved the CAA explained: "*Section 8* requires the Council to adopt appropriate implementing acts, and makes October 1, 1978, the effective date of this Council Act." H.R.Rep. No. 95–890, at 5 (1978). The attached report from the Council of the District of Columbia similarly states that Section 8 "directs the Council to adopt any further acts which may be necessary to implement the Amendment and prohibits the submission of any initiative or referendum

petitions to the Board until after October 1, 1978." *Id.* at 17.

12. Article I, Section 8, Clause 18 provides: "The Congress shall have Power . . . [t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

the District Charter, each of which had a distinct purpose. Charter Amendment No. 1—now codified as Subpart 1—establishes the rights of initiative and referendum. The codified version of Section 8 of Amendment No. 1 (D.C.Code § 1–204.107) instructs the Council to "adopt such acts as are necessary to carry out the purpose of this subpart [Amendment] within 180 days of the effective date of this subpart." Charter Amendment No. 2—Subpart 2 as codified—establishes the right of recall. A corresponding provision, D.C.Code § 1–204.115, instructs the Council to "adopt such acts as are necessary to carry out the purpose of this subpart. . . ."

Considered in context, this "necessary to carry out the purpose" language was a mandate to enact implementing legislation—to adopt such acts as are necessary to make the rights of initiative, referendum, and recall available to the people of the District of Columbia—and to do so in a timely manner. It did not grant any license to restrict those rights, which had been established through the painstaking process of amending the Charter.

### B. Limiting Subject Matter

The implementing legislation arrived (albeit beyond the 180–day period allotted) in the form of the Initiative, Referendum and Recall Procedures Act of 1979. This legislation, among other things, prescribed the form in which a measure must be submitted and the number of copies required, and established timetables and procedures for processing it. D.C.Code § 1–1001.16.[13]

The Board must reject a petition that is not in the proper form. D.C.Code § 1–1001.16(b)(1)(B). Moreover, "the Board shall refuse to accept the measure if the Board finds that it is not a proper subject of initiative . . . under the terms of title IV of the District of Columbia Home Rule Act [the District Charter]. . . ." D.C.Code § 1–1001.16(b)(1). These were genuine implementing steps. But the Council went further and inserted a restriction on the subject matter an initiative could address-a limitation not found in the Charter or in the Home Rule Act.

Reacting to understandable concerns that the rights of initiative and referendum could be misused by the majority to discriminate against minorities, the Council instructed the Board (in the IPA) to refuse to accept a measure if it "authorizes, or would have the effect of authorizing, discrimination prohibited under Chapter 14 of Title 2 [the Human Rights Act.]" D.C.Code § 1–1001.16(b)(1)(C). But the legitimacy of this concern does not mean that the Council had the authority to restrict a right established in the Charter. In light of the current litigation, it is striking that, while the IPA was under consideration, both the Corporation Counsel and the legislature's own General Counsel warned that the Council did not have the power to impose this limitation on the right of initiative. The Office of Corporation Counsel explained, for example, that

[t]he merits of the policy embodied by this restriction on the voters' rights is

---

13. For example, the supporters of an initiative "shall file with the Board 5 printed or typewritten copies of the full text of the measure, a summary statement of not more than 100 words, and a short title of the [proposed initiative]. . . ." D.C.Code § 1–1001.16(a)(1). If the Board accepts the initiative or referendum measure, "[w]ithin 20 calendar days, of [such acceptance]," it must, among other things, "[p]repare, in the proper legislative form, the proposed [measure]." D.C.Code § 1–1001.16(c)(3). "After preparation, the Board shall adopt the summary statement, short title, and legislative form at a public meeting and shall within 5 days, notify the proposer of the measure of the exact language. In addition, the Board, within 5 days of adoption, shall submit the [same information] to the District of Columbia Register for publication." D.C.Code § 1–1001.16(d).

beside the point. Any substantive restrictions on the rights of the voters granted by Charter Amendment No. 1 are contrary to that Amendment and, hence, are void and of no effect. Such legislation may only be accomplished by the Charter Amending Procedure or by Act of Congress.

Supplemental Memorandum from Louis P. Robbins, Principal Deputy Corporation Counsel, Office of the Corporation Counsel, to Judith W. Rogers, Special Assistant for Legislation, 2 (June 2, 1978); 3 Op. C.C.D.C. 102, 103 (1978).[14]

The majority brushes aside these "doubts expressed by lawyers," emphasizing that "the elected representatives of the people—the Council and the Mayor—thought otherwise." (Majority Opinion at 31, 32) But this is a question of legal or "constitutional" authority, not a matter of political judgment.

> We perceive no principled basis for deferring to the Council's interpretation of the Home Rule Act, apart from the merits of the Council's argument. Although "the interpretation of its powers by any branch is due great respect from the others[,] ... '[i]t is emphatically the province and duty of the judicial department to say what the law is.'" *United States v. Nixon*, 418 U.S. 683, 703, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (quot-

ing *Marbury v. Madison*, 1 Cranch 137, 177, 2 L.Ed. 60 (1803)).

*District of Columbia v. Washington Home Ownership Council, Inc.*, 415 A.2d at 1351 n. 5.

The Corporation Counsel gave sound advice in 1978. The rights of initiative, referendum, and recall had become part of the Charter, which cannot be amended except by Act of Congress or by going through the Charter Amendment process. The "necessary to carry out" language in the Charter Amendments Act did not give the Council power to enact legislation inconsistent with the Charter Amendments. *Price v. District of Columbia Board of Elections and Ethics*, 645 A.2d 594, 598–99 (D.C.1994) (citing *Convention Center III*, 441 A.2d at 915). "[L]egislation implementing the Charter Amendments is valid only if it does not conflict with the Charter Amendments." *Id.* "Nor could the Council amend the Charter Amendments by enacting the IPA since, as the Self–Government Act clearly provides, the Charter may be amended only as provided in D.C.Code § 1–205(a) (1992) [now codified as D.C.Code § 1–203.03(a) (2001)]." *Price*, 645 A.2d at 599.

## VI. Appellees' Arguments

### A. Should We Abstain?

Invoking the Supreme Court's decision in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct.

---

**14.** Both the Office of Corporation Counsel and the General Counsel of the Council of the District of Columbia issued cautionary advice on more than one occasion while the IPA was under consideration. For example, commenting in the spring of 1978, Corporation Counsel stated: "Additional restrictions in the subjects subject to initiative which are not in the Charter Amendment could not be made pursuant to an act of the Council, but only through the Charter Amendment procedure." Memorandum from Louis P. Robbins, Principal Deputy Corporation Counsel, to Judith W. Rogers, Special Assistant for Legislation, 6 ¶ 2 (May 2, 1978); 3 Op. C.C.D.C. 60, 65 (1978).

The General Counsel stated that in contrast to all the other limitations on the right of initiative, which were "procedural in quality" and provided for a "ministerial review process ... consistent with the function of an implementing act[,]" the antidiscrimination provision "engrafts ... a new requirement not in the Charter amendment...." Memorandum from Edward B. Webb, Jr., General Counsel, to Council Members, 2 (June 7, 1978) (attaching the supplemental memorandum from Corporation Counsel). The General Counsel opined that "[c]learly, this is an indirect attempt to further amend the Charter and is, therefore, legally without effect." *Id.*

691, 7 L.Ed.2d 663 (1962), the District urges us to abstain from deciding this case. It argues, among other things, that the Council's inclusion of anti-discrimination provisions in the Initiative, Referendum and Recall Procedures Act of 1979 has "functioned successfully" over the past decades and now forms part of a statutory scheme upon which the government and the public rely. This argument surely overstates the case. Although the Human Rights Act limitation on the right of initiative has existed for more than thirty years, this is the first challenge to its validity.[15] More importantly, *Baker* makes plain that "[t]he courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority[,]" 369 U.S. at 217, 82 S.Ct. 691, which is precisely what is at issue here.

By conducting this review of the Council's action, we are not, as the District of Columbia asserts, expressing a lack of the respect due a coordinate branch of government. To the contrary, we proceed cautiously, recognizing "the need to 'balance deference to the legislative authority of the Council, with our own duty to oversee Council action which might exceed congressionally delegated authority.'" *Atchison v. District of Columbia,* 585 A.2d 150, 156 (D.C.1991) (quoting *American Federation of Government Employees v. Barry,* 459 A.2d 1045, 1050 (D.C.1983)).

We frequently have had to decide the scope of the Council's authority under the Home Rule Act. *Compare Washington Home,* 415 A.2d 1349 (Council had no authority to pass another substantially identical emergency act in response to same emergency) *with United States v. Alston,* 580 A.2d 587 (D.C.1990) (after period of congressional review was doubled for certain types of legislation, Council had authority to pass successive, substantially identical emergency acts to preserve the status quo while identical legislation enacted by the Council after two readings was pending before Congress for review); *see also Umana v. Swidler & Berlin, Chartered,* 669 A.2d 717, 724 n. 15 (D.C.1995) (Home Rule Act does not "limit the Council's authority to enact or to alter the substantive law to be applied by the courts"); *Capitol Hill Restoration Society, Inc. v. Moore,* 410 A.2d 184 (D.C.1979) (Council's grant of appellate court jurisdiction in certain noncontested cases impermissibly altered this court's jurisdiction.). Furthermore, we have often considered the proper scope of the right of initiative, and we have rejected an "argument that adoption of the initiative right by the Council, Mayor, and electorate violated the District's Charter." *Stevenson v. District of Columbia Board of Elections and Ethics,* 683 A.2d 1371, 1375 (D.C.1996). We also have addressed the validity of a separate portion of the IPA. *See Price,* 645

---

**15.** In *Hessey III* we held that a proposed initiative would not violate the HRA. *Hessey v. Burden,* 615 A.2d 562, 579 (D.C.1992) (*Hessey III*). Apparently none of the parties challenged the validity of the HRA limitation on the right of initiative. In *Committee for Voluntary Prayer v. Wimberly,* 704 A.2d 1199 (D.C.1997), opponents of a voluntary prayer initiative argued that it violated the HRA as well as the constitution. We did not consider whether the initiative violated the HRA because we affirmed the trial court's holding that the initiative was "patently, obviously,

and unquestionably unconstitutional." *Id.* at 1201, 1203. More importantly, there is no indication that either party challenged the validity of the HRA limitation. "When instances which actually involve the question are rare, or have not in fact occurred, the weight of the mere presence of acts on the statute book for a considerable time, as showing general acquiescence in the legislative assertion of a questioned power, is minimized." *Myers v. United States,* 272 U.S. 52, 171, 47 S.Ct. 21, 71 L.Ed. 160 (1926).

A.2d at 600 (concluding that a portion of the IPA conflicted with the Charter Amendments). The District does not satisfactorily explain why this case is so different that we must, or even may, abstain from deciding it.

## B. Unique Insight?

The District also points out that most of the same Councilmembers who passed the Charter Amendments Act approved the Initiative, Referendum and Recall Procedures Act of 1979. It argues that, "although the second Council could not change the Charter through ordinary legislation, its unique insight into what the CAA meant gave its interpretation through the IPA presumptive validity." However, the cases on which the District relies do not support this proposition. Moreover, we have seen no indication that the Councilmembers who enacted the IPA (thereby imposing the Human Rights Act limitation on the right of initiative) thought they were interpreting the CAA or purported to rely on insiders' knowledge of its purpose. Nor did they profess unique understanding of what the "necessary to carry out" language meant.

The District and the majority focus single-mindedly on the supposed intent of the Council in drafting and "interpreting" the CAA. See, e.g., ante at 160 ("what the Council did in enacting the IPA provides an authoritative interpretation of the intent and meaning of the CAA"). Tellingly, however, they point to no evidence that the voters of the District or members of Congress (all indispensable partners in amending the Charter) thought they were delegating to the Council an undefined power

to limit the right of initiative in any way the Council thought necessary.[16]

The District misplaces its reliance on *Eldred v. Ashcroft*, 537 U.S. 186, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003), where the Supreme Court noted that it "has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our Government and framers of our Constitution were actively participating in public affairs, acquiesced in for a long term of years, fixes the construction to be given [the Constitution's] provisions." *Id.* at 213, 123 S.Ct. 769 (quoting *Myers v. United States*, 272 U.S. 52, 175, 47 S.Ct. 21, 71 L.Ed. 160 (1926)). This case is not comparable to *Eldred*, where the Court relied upon "Congress' unbroken practice since the founding generation...." 537 U.S. at 213–14, 123 S.Ct. 769. "History reveal[ed] an unbroken congressional practice of granting to authors of works with existing copyrights the benefit of term extensions so that all under copyright protection will be governed evenhandedly under the same regime." *Id.* at 200, 123 S.Ct. 769. The Court explained: "Such consistent congressional practice is entitled to very great weight, and when it is remembered that the rights thus established have not been disputed during a period of [over two] centur[ies], it is almost conclusive." *Id.* at 213, 123 S.Ct. 769 (internal quotations and citation omitted).

By contrast to *Eldred*, the provision at issue here has been in existence for about thirty years (as opposed to over two hundred). More importantly, the District has not pointed us to, nor can we find, any

16. "Since amendments to the Charter required Congressional approval when the initiative right was approved by Congress, D.C.Code § 1–1320 (1991 Repl.), the court must consider Congressional intent in approving the amendment. Because the Charter amendment is in the form of an act passed by the Council, and because the Charter Amendment on the right of initiative included authority for the Council to adopt implementing legislation, the court must address the intent of the Council." *Hessey II*, 601 A.2d at 7.

"routine application" or "consistent legislative practice" that has been followed by the Council or approved by the voters or Congress.[17] The most that can be said is that the Human Rights Act limitation has gone unchallenged for more than thirty years. The *Myers* decision, on which *Eldred* relied, makes clear that the legislature may not unilaterally determine the extent of its authority:

> In the use of Congressional legislation to support or change a particular construction of the Constitution by acquiescence, its weight for the purpose must depend not only upon the nature of the question, but also upon the attitude of the executive and judicial branches of the Government, as well as upon the number of instances in the execution of the law in which opportunity for objection in the courts or elsewhere is afforded. When instances which actually involve the question are rare, or have not in fact occurred, the weight of the mere presence of acts on the statute book for a considerable time, as showing general acquiescence ..., is minimized.

272 U.S. at 170–71, 47 S.Ct. 21. It was a crucial factor in *Myers* that "the decision of the First Congress on a question of primary importance in the organization of the government ... was soon accepted as a final decision of the question by all branches of the government." *Id.* at 136, 47 S.Ct. 21. Nothing comparable has happened here, and we therefore are not persuaded by the District's argument relying on *Eldred* and *Myers*.

## C. The Council's Rationale

When one focuses on the subject matter restriction imposed by the IPA, an obvious question arises: Why didn't the Council simply add the Human Rights Act limitation to its draft of the Charter Amendments Act?[18] No satisfactory answer has emerged from the legislative history of the CAA. However, the history of the IPA strongly suggests that the "Human Rights Act limitation" was an afterthought, a concern brought to the Council's attention after the Charter had been amended. D.C. Council, Report on Bill No. 2–317 at 5 (May 3, 1978) ("Subsequent to the public hearing [on the IPA], the Committee staff received myriad telephone calls in support of an amendment to the enabling legislation which would restrict consideration of initiative measures which foster discrimination. Such an amendment was adopted by the Committee in reporting this measure."). When

---

**17.** No inference of approval may fairly be drawn from the failure of Congress to disapprove the IPA, which contained the Human Rights Act limitation on the right of initiative. *See Springer v. Government of the Philippine Islands*, 277 U.S. 189, 209, 48 S.Ct. 480, 72 L.Ed. 845 (1928) ("The inference of an approval by Congress from its mere failure to act at best rests upon a weak foundation. And we think, where the inference is sought to be applied, as here, to a case where the legislation is clearly void as in contravention of the Organic Act, it cannot reasonably be indulged."); *Clayton v. People of the Territory of Utah*, 132 U.S. 632, 642, 10 S.Ct. 190, 33 L.Ed. 455 (1890) ("At all events, it can hardly be admitted, as a general proposition, that, under the power of congress reserved in the organic acts of the territories to annul the acts of their legislatures, the absence of any action by congress is to be construed to be a recognition of the power of the legislature to pass laws in conflict with the act of congress under which they were created."). *But see* majority opinion at note 45.

**18.** The Council approved the original version of the Charter Amendments Act before it passed the Human Rights Act. The Mayor signed the Human Rights Act on September 28, 1977. 24 D.C.Reg. 6038 (Jan. 27, 1978). However, the Council amended the Charter Amendments Act four weeks later, before it was presented to the voters on November 8, 1977. H.R.Rep. No. 95–890, at 2.

imposing this limitation on subject matter, the members of the Council did not suggest that the CAA had empowered them to do so. Rather, they invoked authority outside the CAA-the Supreme Court's decision in *Reitman v. Mulkey*, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), and the Council's own statutory authority over elections. D.C. Council, Report on Bill No. 2–317 at 11 (May 3, 1978). Neither rationale gave the Council authority to amend the Charter.

### 1. *Reitman v. Mulkey*

*Reitman* considered a provision of the California Constitution that had been initiated by the voters, but the Supreme Court's holding is no more a check on the right of initiative than it is on acts passed by a legislature. So far as the decision discloses, it was irrelevant that the provision was adopted by initiative.

According to the California Supreme Court, that initiative (Proposition 14) was designed "to overturn state laws that bore on the right of private sellers and lessors to discriminate" and "to forestall future state action that might circumscribe this right." 387 U.S. at 374, 87 S.Ct. 1627. When enacted, it became Art. I, § 26, of the California Constitution,[19] but the state Supreme Court held that it "was invalid as denying the equal protection of the laws guaranteed by the Fourteenth Amendment." *Id.* at 373, 87 S.Ct. 1627. Affirming, the Supreme Court of the United States accepted the California court's conclusion "that § 26 would and did have wider impact than a mere repeal of existing statutes.... The right to discriminate,

including the right to discriminate on racial grounds, was now embodied in the State's basic charter, immune from legislative, executive, or judicial regulation at any level of the state government." *Id.* at 376–77, 87 S.Ct. 1627. "The California Supreme Court believes that the section will significantly encourage and involve the State in private discriminations[,]" and the Supreme Court of the United States concluded that it had "been presented with no persuasive considerations indicating that these judgments should be overturned." *Id.* at 381, 87 S.Ct. 1627.

Of especial interest here, the Supreme Court of California had rejected an effort to keep the proposition off the ballot, reasoning "that it would be more appropriate to pass on those questions after the election ... than to interfere with the power of the people to propose laws and amendments to the Constitution and to adopt or reject the same at the polls." *Mulkey v. Reitman*, 64 Cal.2d 529, 50 Cal.Rptr. 881, 413 P.2d 825, 829 (1966) (quoting the court's previous order). Moreover, the provision was struck down because it violated the federal Constitution, not because it was deemed inconsistent with a state law. *Reitman* clearly does not stand for the proposition that one act of the Council (here, the IPA) can place another act of the Council (even one prohibiting discrimination) off-limits to the initiative process.

### 2. Section 752

The Council also invoked, and appellees now rely upon, D.C.Code § 1–207.52 (2006) ("Section 752" of the Home Rule Act),

---

**19.** Art. I, § 26, provided:

Neither the State nor any subdivision or agency thereof shall deny, limit or abridge, directly or indirectly, the right of any person, who is willing or desires to sell, lease or rent any part or all of his real property, to decline to sell, lease or rent such property to such person or persons as he, in his absolute discretion, chooses.

387 U.S. at 371, 87 S.Ct. 1627. The real property covered by § 26 was limited to residential property. *Id.* The section did not apply to state-owned real estate. *Id.*

which grants the Council "authority to enact any act or resolution with respect to matters involving or relating to elections in the District." We emphasize, however, what we have said before—"nothing in Section 752 . . . grants the Council authority to amend the Charter. . . ." *Price*, 645 A.2d at 599.

At the time Section 752 was enacted, the right of initiative did not exist. It therefore is far from clear that Congress would have thought that the phrase "matters involving or relating to elections in the District" encompassed initiatives. More fundamentally, given that Section 752 predates by five years the creation of the right of initiative, it is implausible that Congress intended Section 752 to confer upon the Council power to exclude whole subject areas from consideration by the electorate.

In any event, if Section 752 is as broad as appellees assert, why was the Charter Amendments Act necessary? Why didn't the Council simply use its power over elections to create the rights of initiative, referendum, and recall? One obvious answer is that, even if an initiative is an election, it is much more—it is an exercise of legislative power. The Charter provided that "the legislative power granted to the District by [the Home Rule Act] is vested in and shall be exercised by the Council in accordance with this chapter." D.C.Code § 1–204.04. Allowing the voters to exercise legislative power amounted to a further delegation of Congress's authority. Creating that right thus required a Charter Amendment.

If a Charter amendment was necessary to create the right of initiative, an amendment is equally necessary to limit that right. *See Price*, 645 A.2d at 599. And by restricting the subject matter which an initiative may address, the Human Rights Act limitation unmistakably alters (and reduces) the right of initiative. The Council's authority relating to elections, found in Section 752, did not (and cannot) authorize a restriction amounting to an amendment of the Charter.[20]

Finally, appellees have offered no satisfactory answer to the following question: If the Council's powers are as broad as they assert, what is to preclude the Council from imposing additional subject matter limitations on the right of initiative or, indeed, from extinguishing that right altogether? It appears that a candid answer to that question would be "nothing." Yet, under our "constitutional" principles, a Charter right may not be limited or extinguished by ordinary legislation. That may be done only by going through the intentionally-cumbersome process of amending the Charter.

### D. Inappropriate for Direct Democracy?

The District also argues that it is a mistake to read the CAA literally, as establishing a right of initiative "coextensive" with the legislative power of the Council except for one express limitation—"laws appropriating funds." It asserts that "the most reasonable conclusion is that the CAA was intended to authorize the electorate to vote on topics generally, but not those inappropriate for direct democracy." We have found no support whatsoever for this proposition in the CAA's text or its legislative history.

---

**20.** If the logic of the majority's argument were followed, one wonders if the Council, using its power under Section 752, could instruct the Board of Elections to refuse to accept petitions from certain classes of candidates running for election to the Council—even though they met the qualifications for holding office established in the District Charter?

Although the District concludes that the "Human Rights Act limitation" was wisely imposed, "consistently with our fundamental political traditions[,]" it offers little guidance on how one determines which topics are "inappropriate for direct democracy." If this is to be the standard, it is impossible to predict how large this newly hypothesized exception to the right of initiative may grow in the future.

Even if we assume that the people at large are more likely to discriminate against minorities than are their elected representatives, appellees forget that there are numerous checks and balances in place here to protect against the tyranny of the majority. Appellants' proposal may be defeated at the polls. If the initiative passes, Congress may disapprove it. *See* D.C.Code § 1–204.105 (2006). Moreover, the Council will have the opportunity to amend or repeal the measure if it becomes law. *See Atchison v. District of Columbia,* 585 A.2d at 155 ("[T]he plenary legislative power given the Council includes the authority to repeal existing legislation, whether or not derived from an initiative."). And the courts will strike down any measure that is unconstitutional. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). In short, in the District of Columbia, the right of initiative is not an example of unchecked democracy. It exists, rather, in conjunction with a republican form of government based on the principle of separation of powers.

\* \* \*

It should be clear that no one on this court doubts the importance of the Human Rights Act. Non-discrimination, tolerance, acceptance, and inclusion are all fundamental values to be fostered in a pluralistic society. But these aspirations are best achieved through a system of laws, and it is vital that the institutions of the District government observe the limits placed upon them by the Home Rule Act and the Charter. It is "our ... duty to oversee Council action which might exceed congressionally delegated authority.'" *Atchison,* 585 A.2d at 156. The Council of the District of Columbia exceeded its authority when it imposed the "Human Rights Act limitation" on the right of initiative. We respectfully dissent.